## KISSAM *v.* ANDERSON.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE
SOUTHERN DISTRICT OF NEW YORK.

No. 202.   Argued March 11, 14, 1892. — Decided May 16, 1892.

The 3d National Bank in New York was the correspondent of the Albion
Bank, a country bank.   W., during part of the time in which the transac-
tions in controversy took place, was cashier, and during the remainder was
president of the Albion Bank.   During all the time W. practically managed
that bank, and his co-directors and other officers had little or no oversight
of its affairs.   He was engaged in stock speculations on his own account
in New York, and drew from time to time for his own purposes in favor
of K. & Co., his brokers, on the bank balance with the 3d National Bank.
K. & Co. from time to time returned to that bank sums to be credited to
the Albion Bank.   The latter bank eventually became insolvent, being
ruined by fraudulent operations of W. who disappeared, and was put in
the hands of a receiver, who brought suit against K. & Co. to recover the
sums so paid to them by W. out of the balance to the credit of the bank
with the 3d National.   K. & Co. claimed to offset the return payments
made by them to the 3d National; but the trial court ruled that they
were not entitled to do it; and no question in respect of them was sub-
mitted to the jury.   *Held,* that the defendants were entitled to have it
submitted to the jury whether the other directors and officers of the
Albion Bank might not, in the exercise of reasonable and proper care,
have ascertained that these moneys had been deposited to the credit of
the Albion Bank, and whether they would or would not have accepted
such deposits as the return of the moneys to the bank.

THE case, as stated by the court, was as follows:

The First National Bank of Albion was organized under
the national banking law December 22, 1863, with a capital
stock of $50,000, consisting of five hundred shares of $100
each, with a privilege of increase, and in fact afterwards in-
creased to $100,000. ' It was reorganized under the act of July
12, 1882, by amended articles of association filed January 12
and approved February 24, 1883.   On August 21, 1884, it
closed its doors, and the defendant in error was appointed re-
ceiver, and took possession August 28, 1884.   On January 7,
1885, as such receiver he commenced this action against the
plaintiffs in error in the Circuit Court of the United States for

the Southern District of New York. On April 25, 1888, the case was tried before a jury, and a verdict rendered in favor of the plaintiff for $147,759.71. A judgment was rendered on the verdict, and to reverse such judgment defendants sued out this writ of error.

The proposition upon which this suit was maintained was that A. S. Warner, the cashier of the Albion Bank, wrongfully withdrew the funds of that bank for the purpose of a personal speculation in stocks; and that the defendants, Kissam, Whitney & Co., received those moneys with knowledge that they were thus withdrawn, and used them for the benefit of Warner in his stock speculations. The defendants, among other things, pleaded that the most of the money received from Warner had been returned to the bank; and herein lies the principal question for our consideration, and to a clear understanding of all that is involved in it, a detail of the facts is necessary.

Prior to March 29, 1879, R. S. Burrows was president of the Albion Bank; Alexander Stewart, his son-in-law, vice-president; and Warner, cashier. At that date Burrows died. Stewart became president, and so remained until he died, November 20, 1881, Warner in the meantime remaining cashier. Thereafter Warner became president, and W. R. Burrows, a son of R. S. Burrows, cashier, and both continued as such until shortly before the failure of the bank. The bank really belonged to R. S. Burrows in his lifetime, he owning all but twenty shares. The directors, pending the transactions hereafter to be reviewed, were L. Burrows, Alexander Stewart, W. R. Burrows, Louise C. Burrows and Warner. With the exception of L. Burrows, who was a brother of R. S. Burrows, the other four were the executors and executrix of R. S. Burrows; Warner, as appears, being the managing executor as well as the real official head of the bank. Through his defalcations, which ran up into the hundreds of thousands, the bank ultimately failed, and a receiver was appointed. The firm of Kissam, Whitney & Co., the defendants, was formed in May, 1880. Prior to that time the firm of Chase & Atkins had been in existence for some years, and that firm had bought and sold

stocks for Warner. Whitney and Washburn, who, with Kissam, composed the firm of Kissam, Whitney & Co., had been clerks in the employ of Chase & Atkins, and a few months before had received small interests therein as partners. Kissam had no connection with that firm. When Chase & Atkins sold out to Kissam, Whitney & Co. the latter took among other things the account with Warner. At that time, and among the assets transferred, were stocks to the amount of $348,086.19, held for Warner, and for which Kissam, Whitney & Co. paid Chase & Atkins. Thereafter, and between that time and August 26, 1881, Warner sent to defendants 12 checks, the dates and amounts thereof being as follows:

| | |
|---|---|
| May 11, 1880 | $10,000 |
| June 9,  " | 5,000 |
| Dec. 23,  " | 8,000 |
| Jan. 10, 1881 | 5,000 |
| " 11, " | 10,000 |
| " 13, " | 15,000 |
| " 17, " | 10,000 |
| " 24, " | 10,000 |
| Feb. 1, " | 5,000 |
| Mch. 25, " | 5,000 |
| Aug. 9, " | 10,000 |
| " 26, " | 10,000 |
| Total | $103,000 |

These checks were drawn by him as "cashier," on the Third National Bank of New York City, the regular correspondent of the Albion Bank: the first checking being in this form:

"No. —.                     NEW YORK, May 11, 1880.

"Third National Bank of the City of New York pay to the order of Kissam, Whitney & Co. ten thousand dollars.

"$10,000.                     A. S. WARNER,

"Cash. First Nat. B'k of Albion, N. Y.;"

and the others substantially like it.   The Albion Bank was a country bank, with, as heretofore stated, a capital stock of $100,000, and an average deposit of about $200,000.   On these checks, Kissam, Whitney & Co. drew from the Third National Bank the sums named, and used the same in their customers' stock transactions.   Afterwards, and from time to time, they returned to the Third National Bank certain sums of money, which were entered by that bank to the credit of the Bank of Albion, and notice thereof was sent in the regular course of business by the former to the latter bank; but by reason of facts hereafter to be noticed, not all of these deposits were entered on the books of the Albion Bank.   The following is a statement of the details of such deposits:

| Date. | Entered in Ledger of Albion Bank. | Not entered in Ledger of Albion Bank. |
|---|---|---|
| April        4, 1881..... | ............... | $8,000  00 |
|  "           14,   "   ..... | ............... | 5,590  00 |
|  "          23,   "   ..... | ............... | 9,200  00 |
| April        3, 1882..... | ............... | 10,000  00 |
| March       7, 1883..... | ............... | 5,000  00 |
| April       17,   "   ..... | $6,000  00 | |
| November 15,   "   ..... | 4,000  00 | |
|  "           "    "   ..... | ............... | 5,000  00 |
|  "          21,   "   ..... | 8,000  00 | |
| December 31,   "   ..... | 7,850  00 | |
| March       7, 1884..... | ............... | 5,000  00 |
| April       11,   "   ..... | ............... | 5,000  00 |
| July        28,   "   ..... | ............... | 8,000  00 |
|  "           "    "   ..... | ............... | 2,562  50 |
| Totals......... | $25,850  00 | $63,352  50 |

It will be noticed that three of these deposits were made before the last two checks were sent to defendants.   It will be noticed, also, that the moneys represented by these various deposits were returned to the same place from which the

money was received on the checks sent to the defendants, to wit, the Third National Bank. In other words, the defendants received money belonging to the Albion National Bank from the Third National Bank; they returned to the Third National Bank a large portion of the money they had received. That money was accepted by the Third National Bank, passed to the credit of the Albion Bank, and the latter notified thereof in the regular way, to wit, by monthly statements. It is true that many of these credits were not entered by the latter on its books. The Albion Bank was at that time managed by Warner, he being the cashier. There was a book-keeper in constant attendance, the president occasionally present, and five directors to supervise; but the active man was Warner, who was also the real manager of the Burrows estate, which owned substantially all the stock. The monthly reports from the Third National Bank, when opened at all, were apparently opened by Warner alone. Indeed, after the receiver was appointed, in 1884, some of these monthly reports were found in the vaults of the bank still unopened. There was no direct evidence of any conspiracy between defendants and Warner to take money from the Albion Bank. On the contrary, it appears that the defendants bought out the business of Chase & Atkins, at that time buying as a part thereof stocks to the amount of over $300,000 held for Warner; and it was in carrying on this business already established, and to make good the required margins, that Warner sent these checks to defendants. His account was a steadily diminishing account from the time they bought out Chase & Atkins. The court held them responsible for the amounts thus obtained from the Albion Bank, on the ground that a cashier has no right to use the funds of the bank of which he is cashier for his private business; and that under the circumstances, and in view of the size of the account and the form of the checks, the defendants must have known that he was using the funds of the bank for his private business.

*Mr. Joseph H. Choate* and *Mr. George Zabriskie* for plaintiffs in error. *Mr. John E. Burrill* was with them on the brief.

*Mr. Benjamin H. Bristow* for defendant in error.

The defendants were not entitled to credit for the sums paid by them to the Third National Bank. They requested the court to instruct the jury that

"(1) The defendants are entitled to be credited with the amounts of money which were deposited by them in the Third National Bank to the credit of the Bank of Albion;

"(2) The defendants were entitled to be credited with such of the amounts so deposited by them in the Third National Bank to the credit of the Bank of Albion, as were entered in the books of the latter bank and thereon debited to the former bank;

"(3) In case they find a verdict for the plaintiff it cannot exceed the difference between the accounts between the two banks as contained on their respective books and interest;

"(4) If the jury find a verdict for the plaintiff, it cannot be for any sum in excess of the difference between the checks in suit and the sums paid by the defendant into the Third National Bank and not entered in the books of the Albion Bank;

"(5) The plaintiff cannot recover any of the checks in suit which have been paid out of moneys deposited in the Third National Bank to the credit of the Albion Bank by Warner or by his direction."

The court refused these requests, saying further, "I have ruled during the course of the trial that the fact that the defendants paid in under Warner's direction to the Third National Bank the large sums of money which were paid in is of no materiality as affecting the legal rights of the parties."

The question raised by all these requests is, in brief, whether any amounts paid into the Third National Bank to the credit of the Bank of Albion by Warner, or by the defendants under his instructions, are to be regarded as reducing the damages recoverable from the defendants.

It is settled by abundant authority that where one has taken the property of another damages are not mitigated by showing

merely that the wrongdoer returned the property without the consent of the owner or applied it upon the owner's debts. It must appear still further that the owner consented to such action or that the proceeds were so applied under legal process without connivance of the wrongdoer. "A stranger could not take the property of his neighbor, have it sold under process, and apply the proceeds in discharging the debts of his neighbor, and then claim the right to have such payments received as a set-off, or in mitigation of the damages done by the trespass." *McAfee* v. *Crofford*, 13 How. 447, 456; *Hanmer* v. *Wilsey*, 17 Wend. 91; *Otis* v. *Jones*, 21 Wend. 394; *Wehle* v. *Butler*, 61 N. Y. 245; *People* v. *Bank of North America*, 75 N. Y. 547; *McMichael* v. *Mason*, 13 Penn. St. 214; *Barnard* v. *Jennison*, 27 Michigan, 230; *Edmondson* v. *Nuttall*, 17 C. B. (N. S.) 279; *Higgins* v. *Whitney*, 24 Wend. 379; *Livermore* v. *Northrup*, 44 N. Y. 107; *Lyon* v. *Yates*, 52 Barb. 237; *Sprague* v. *McKenzie*, 63 Barb. 60; *East* v. *Pace*, 57 Alabama, 521.

Mr. Justice Brewer stated the case as above, and delivered the opinion of the court.

We shall not stop to inquire as to the propriety of the rulings, so far as they went to charge the defendants with liability for the moneys obtained from the Albion Bank; for, on the other ground we think a new trial must be ordered, and it is impossible to foresee what the developments may be on that trial.

The court distinctly ruled, as matter of law, that the defendants were not entitled to credit for the moneys deposited in the Third National Bank to the credit of the Albion Bank, and submitted no question to the jury in respect thereof. The principle upon which the court acted is thus stated by counsel for plaintiff in his brief:

"It is settled by abundant authority that where one has taken the property of another damages are not mitigated by showing merely that the wrongdoer returned the property without the consent of the owner or applied it upon the

owner's debts. It must appear still further that the owner consented to such action or that the proceeds were so applied under legal process without connivance of the wrongdoer. ' A stranger could not take the property of his neighbor, have it sold under process, and apply the proceeds in discharging the debts of his neighbor, and then claim the right to have such payments received as a set-off, or in mitigation of the damages done by the trespass.' *McAfee* v. *Crofford*, 13 How. 447, 456."

We think that principle does not control in this case. Defendants returned this money to the Albion Bank. They deposited it with the Third National Bank, the correspondent of the Albion Bank, and the bank from which they received the money on the checks from the Albion Bank. In fact, therefore, the money was placed where it was before it was taken — in the possession and under the control of the Albion Bank. Not only that, the Third National Bank, in its due course of business, by monthly reports, informed the Albion Bank that they had received this money, and held it subject to its order; and it was subsequently used by the Albion Bank in drafts drawn by it in favor of other parties. If it be said that no officer of the Albion Bank knew of these deposits except Warner, the wrongdoer, and that he subsequently drew out most of these moneys in drafts to further other wrongs, the reply is, that the other officers and directors of the Albion Bank were chargeable with knowledge of these deposits. If, through their negligence, they did not in fact know, that is a matter for which the Albion Bank, and not the defendants, were responsible. Kissam, Whitney & Co. had no supervision over its affairs, no knowledge as to how those affairs were managed. They were not called upon to go to Albion and hunt up the various officers and directors, and inform them, one by one, personally, that these moneys had been deposited to their credit in the Third National Bank. It was enough that they deposited them, and that that bank, in the regular course of business, by monthly statements, informed the Albion Bank that it received and held those moneys. The learned Circuit Judge seemed to be

of the opinion, that as they had assisted Warner in withdrawing these funds from the bank, they could not escape responsibility, unless the sum total of his defalcations was reduced by their deposits to an amount less than that received from him. In his opinion overruling the motion for a new trial, he thus expressed himself: " Here all the money returned by Warner was insufficient to replace his defalcations by an amount much larger than the sum sought to be recovered of the defendants, and the bank had no knowledge that he had returned anything to replace what he had misapplied until he had again misappropriated it. It is not unjust or unreasonable to compel the defendants to restore such of the funds of the bank as they received when they are unable to prove that the bank was not directly or ultimately a loser in consequence of their acts. It may be that Warner would have misappropriated the money of the bank in other ways if they had refused to receive the checks, but certainly one temptation would' not have been in his path if he had found that he could not use the paper of the bank for his speculations with the same facility as though it were his own money." But surely they cannot be held for his subsequent wrong-doing. If they have returned a part of that they assisted him in wrongfully withdrawing, they are *pro tanto* relieved from responsibility, and are not to be chargeable with his after misconduct, in respect to which they had no part. It will not do to say that they put the money where he could check it out, and therefore are responsible for what he did with it. They deposited it to the credit of the Albion Bank, and it was for the officers and directors of that bank to take care of its deposits. The rule might be different if Warner, the cashier of the Albion Bank, was the only officer authorized to draw on the Third National Bank, or charged with knowledge of the state of the account; but the president and teller had equal authority, and were equally chargeable with knowledge; in fact, it appears that these officers did draw drafts on the New York bank and thus diminished the total amount of deposits, and the other directors, also, were under some obligation to know the affairs of the bank; and it will not do

to say that the bank can ignore the negligence of all its officers and profit by their omission of duty. At the least, it was a question to go to the jury whether the officers of the bank, other than Warner, in the exercise of reasonable and proper care, could have ascertained that these moneys had been deposited to the account of the Albion Bank, and would or would not have accepted such deposits as the return of the moneys to the bank.

For the error in this respect, the judgment must be

*Reversed, and the case remanded for a new trial.*