PHILLER et al. v. YARDLEY.

(Circuit Court of Appeals, Third Circuit. July 12, 1894.)

No. 12, March Term, 1894.

NATIONAL BANKS—INSOLVENCY—PREFERENCES—CLEARING HOUSE BALANCES.

By special agreement, a national bank, instead of the usual deposit of securities as collateral for payment of its daily balance at the clearing house, each day left with the clearing house manager all checks drawn on it, and other evidences of its indebtedness received from other banks, to be held until the balance due from it for the day was paid. While certain checks and other evidences of its indebtedness were so held, the bank was closed by the comptroller of the currency. Thereupon the clearing house collected the amount of the checks, etc., from the banks from which they had been received, and therefrom paid, besides the bank's balance for the day, duebills given by it for its balance for the preceding day, by their terms payable only through the clearing house the day after issue, and actually in the exchanges held when the bank closed, and applied the remainder towards cancellation of clearing house loan certificates issued to the bank under an agreement between the banks whereby any loss from failure of one to pay such certificates was chargeable upon the others. *Held* that, as the transaction on the part of the bank was not in contemplation of insolvency, nor with a purpose to give a preference, or to prevent application of its assets as prescribed by law, the exchange between the banks was valid, and that it was not avoided, nor were the rights of the clearing house or of the creditor banks impaired, by what subsequently occurred; and therefore the receiver of

the bank, taking its assets subject to all equities and rights against it, had no equity, in a suit against the managing committee of the clearing house alone, to question the appropriation of the money paid by the other banks.    58 Fed. 746, reversed.

Appeal from the Circuit Court of the United States for the Eastern District of Pennsylvania.

This was a suit by Robert M. Yardley, receiver of the Keystone National Bank, against George Philler and others, being the clearing house committee of the Clearing House Association of the Banks of Philadelphia, to recover certain checks, or the money collected thereon.    The circuit court rendered a decree for plaintiff. 58 Fed. 746.    Defendants appealed.

A. T. Freedley and John G. Johnson, for appellants.
Silas W. Pettit, for appellee.

Before ACHESON, Circuit Judge, and BUTLER and GREEN, District Judges.

ACHESON, Circuit Judge.    Upon a bill brought by Robert M. Yardley, receiver of the Keystone National Bank, against seven individuals, constituting the managing committee of the Philadelphia Clearing House Bank Association, the court below rendered a decree for $70,005.46, with interest from March 20, 1891, against the defendants, who are here the appellants, upon the ground that, after the known insolvency of the named bank, they applied (as was charged) its funds in their hands or under their control to the payment of its debts to the clearing house association, and to members thereof, with a view of giving them an unlawful preference over other creditors.

The clearing house association of the city of Philadelphia is a voluntary, unincorporated association, composed of the national banks of that city; its main object being to effect at one common meeting place, called the "clearing house," the daily exchanges between the associated banks.    Its affairs are under the general supervision of a committee of seven bank presidents, selected by a majority of the associated banks, and serving without compensation.    This committee appoints a manager, who has immediate charge of the conduct of the business at the clearing house.    All exchanges, however, are made directly between the banks themselves, through clerks representing them respectively.    All the checks, drafts, and other evidences of indebtedness to be exchanged are brought to the clearing house in sealed packages, which are never opened there.    The gross amount of the alleged contents of each package is indorsed upon the envelope, but not the items.    The clerk of each sending bank delivers directly to the clerk of the receiving bank the sealed package of checks and other obligations held by the former against the latter bank.    Receipts pass directly between the clerks of the sending and receiving banks. After the exchanges are thus made, the gross totals only are reported to the clearing house manager, who, upon this information, makes up a sheet of differences to be adjusted and settled between

the various banks. Upon this sheet each debtor bank settles the amount due by it to the creditor banks by paying the same to the clearing house manager, who immediately distributes it to and among the creditor banks.

The Keystone National Bank of Philadelphia was a member of the clearing house association. On March 20, 1891, at 8:30 o'clock a. m., the hour fixed for the morning exchange, the messenger of that bank appeared at the clearing house with sealed packages purporting to contain exchanges against other banks, members of the association, amounting to $70,005.46. These packages he delivered directly to the clerks of the other banks, and received from them receipts therefor. At the same time the messengers of other banks, members of the association, delivered to the clerk of the Keystone National Bank sealed packages of exchanges against it, purporting to amount to the sum of $117,035.21, and took from him receipts therefor. Thus there was a balance of $47,029.75 against the Keystone National Bank on that morning's exchange.

After receiving the sealed packages of checks and other exchanges purporting to amount to $117,035.21, the clerk of the Keystone National Bank left those packages in the custody of the manager of the clearing house until the bank should pay the $47,029.75 difference, which it was bound to do by 12 o'clock of that day. The reason for the deposit was this: Article 17 of the constitution of the clearing house association required each bank to deposit with the clearing house committee collateral security for the payment of its daily balances. In December, 1890, however, at the instance and for the benefit of the Keystone National Bank, a special arrangement was entered into between it and the clearing house committee whereby all the security held under article 17 to secure its daily balances was transferred to its loan-certificate account with the clearing house, so as to enable it to receive upon that security further advances of loan certificates, and it was agreed that thereafter, at the morning exchange, the clerk of the Keystone National Bank, after receiving the packages of checks and other exchanges from the creditor banks, should leave the packages with the clearing house manager as security that any debtor balance due by it on that settlement should be paid by the bank before 12 o'clock of the same day.

The Keystone National Bank did not pay its debtor balance of $47,029.75 due on the morning exchange of March 20, 1891, by 12 o'clock that day, and that balance has never been paid or tendered. Shortly after 10 o'clock on the same day, by virtue of an order made by the comptroller of the currency, the Keystone National Bank was closed by William P. Drew, bank examiner, and thereafter Robert M. Yardley was appointed receiver thereof. After 12 o'clock on the same day (March 20, 1891), the clearing house manager, acting under the instructions of the clearing house committee, notified the banks which had presented the packages containing the checks, drafts, and other evidences of indebtedness against the Keystone National Bank for $117,035.21, that they must make those packages good by paying into the clearing house that

amount of money, and accordingly, in compliance with this demand, these banks forthwith paid to the clearing house manager $117,-035.21 in cash, and took away the packages.

After the morning exchange on that day, the state of accounts between the Keystone National Bank and the clearing house association was this: The debtor balance of the bank on that morning's settlement, as we have seen, was $47,029.75. Its debtor balances on the exchanges of the preceding day amounted to $41,197.36, for which it had issued its clearing house duebills,—two thereof, amounting to $23,390.52, to the clearing house association, and several others, amounting to $17,806.84, directly to certain banks of the association. These duebills were in the form prescribed by the rules of the association, bore date March 19, 1891, and by their terms were "payable only in the exchanges through the clearing house the day after issue." Then, in addition to its debtor balances on these exchanges, the Keystone National Bank owed $335,000 on clearing house loan certificates which had been issued to it previously by the clearing house committee, agreeably to the provisions of a written agreement between all the associated banks. To secure the payment of this last-mentioned indebtedness for $335,000, the bank had deposited with the clearing house committee collateral securities; but the other banks were ultimately responsible for that debt in case of a deficiency in the collaterals, for by the terms of the written agreement referred to any loss caused by the nonpayment of clearing house loan certificates issued by the committee to any member of the association was assessable upon all the other banks in the ratio of capital.

The money, namely, the $117,035.21, which the other banks, upon the call of the clearing house committee, paid on March 20, 1891, to the clearing house manager, he immediately appropriated, by the direction of the committee, in manner following: To make good the balance due by the Keystone National Bank on that morning's exchanges, $47,029.75; to the payment of the duebills given by the bank for its debtor balances on the exchanges of the preceding day, $41,197.36; and the residue, $28,808.10, he applied towards the cancellation of the clearing house loan certificates which had been issued to that bank. Has the receiver of the bank any just reason to complain of that appropriation, or of the transaction in any respect?

The receiver of an insolvent national bank takes its assets subject to all just claims and defenses that might have been interposed against the corporation itself; and all liens, equities, and rights arising by express agreement, or implied from the nature of the dealings between the parties, or by operation of law, prior to insolvency, and not in contemplation thereof, remain unimpaired. Scott v. Armstrong, 146 U. S. 499, 510, 13 Sup. Ct. 148. The morning exchange on March 20th between the Keystone National Bank and its clearing house associates, in itself, was unimpeachable. It took place before the bank examiner acted. The clearing house association had no reason to suspect the impending failure. On the part of the bank itself the transaction was in the regular course of its business, and with a view to continued opera-

tions. It did not act in contemplation of insolvency, nor with a purpose to give one creditor a preference over another, or to prevent the application of its assets in the manner prescribed by law in case of insolvency. The rights of the parties were fixed when the bank was closed. As between the Keystone National Bank and the other banks, the morning exchange had been already consummated. The packages of exchanges on the one side and the other had been delivered and receipted for. The exchange itself was an accomplished fact. What remained to be done was the payment by the Keystone National Bank of its debtor difference of $47,029.75 to the clearing house manager. To insure this payment by 12 o'clock, the bank, under its arrangement with the clearing house committee, left its sealed packages in the hands of the clearing house manager. The bank, however, defaulted, and what afterwards occurred in the clearing house was in consequence. The situation was unprecedented. The bank had been closed by the government officer. The pledge was not an ordinary one. The sealed packages on temporary deposit with the clearing house manager did not contain assets of the bank, but checks and drafts drawn upon it, and other evidences of its indebtedness. As the packages contained commercial paper, prompt action might be necessary to hold indorsers and drawers. In the emergency, occasioned wholly by the default of the Keystone National Bank, whose supposed equity is the foundation of this bill, the clearing house committee made the call upon the other banks already mentioned. Whether those banks were bound to comply with that demand to its full extent we need not inquire. Under the stress of the situation they saw fit to do so, and paid into the clearing house, of their own moneys, $117,035.21, and relieved the manager of his custody of the packages. Did this work an annulment of the morning exchange? We cannot so conclude. That deduction would be highly unreasonable. That the banks which paid in this money intended such a result is incredible. The whole transaction negatives the idea of intended rescission. Indeed, the other banks had no right to undo the morning exchange without the concurrence of the Keystone National Bank. Nor was it to their interest to disturb what had taken place. Why should they pay this large sum of money into the clearing house in relief of the debtor bank? Assuredly, this money was not paid for the benefit or use of the Keystone National Bank. The other banks made the payment in promotion of their own interests as members of the association, primarily in order that they might make settlements inter se. This they were at liberty to do without relinquishing any of their rights or equities as against their defaulting associate. The obligation of the Keystone National Bank to pay its debtor balance remained in full force. Without the payment of the $47,029.75, the bank was not entitled to the return of the deposited packages. Hence those packages were rightfully withheld from the bank. Nothing is better settled than the right of a transferee of a pledge to hold it until the debt for which it was given is paid. Story, Bailm. § 327; Donald v. Suckling, L. R. 1 Q. B. 585; Talty v. Trust Co., 93 U. S. 321. This principle is peculiarly

applicable here, for the clearing house manager held the deposited packages for the benefit of the creditor banks. It is our judgment that the morning exchange between the associated banks was valid, and was not avoided, or the rights thereunder of the clearing house association or of the creditor banks impaired, by what subsequently occurred.

It is quite plain that the court below proceeded upon views radically different from those we have expressed. The decree, it will be perceived, entirely overlooks the default of the Keystone National Bank, and puts the receiver in a far better position than the bank would have been in had it fulfilled the terms of its pledge. Had it done that, it would have paid into the clearing house $47,-029.75, whereas, without paying anything, the receiver has a decree requiring the defendants to account to him for the whole $70,-005.46. We are unable to accept that result as just. The principle of the decision of the supreme court in the case of Scott v. Armstrong, supra, requires that the equities and rights arising from the express agreements or implied from the nature of the dealings between the Keystone National Bank on the one side and the clearing house association or the other members thereof on the other side, prior to the closing of the bank, shall be preserved and enforced.

Was anything done prejudicial to the rights of the Keystone National Bank or its receiver? As already stated, the clearing house duebills, amounting to $41,197.36, which the bank had given for its balances on the exchanges of the preceding day, were paid out of the fund claimed by the receiver. Can the rightfulness of that appropriation be gainsaid? On the face of each duebill it was stipulated that it was "payable only in the exchanges through the clearing house the day after issue." Those duebills were actually in the morning exchange on March 20, 1891. They were in the packages amounting to $117,035.21, delivered to the clerk of the Keystone National Bank. They were entitled to payment out of the bank's credit of $70,005.46 in that morning's exchanges. The application of the $41,197.36 to those duebills was therefore right, even upon the receiver's hypothesis as to the origin of the fund which the clearing house manager disbursed. The duebills were extinguished. By no possibility can they come against the funds in the hands of the receiver.

Is the receiver in any position to question the application of the $28,808.10 to the indebtedness of the Keystone National Bank as a member of the clearing house association on its loan-certificate account? That liability arose from the course of dealings between the bank and the clearing house, and under an express agreement between all the members thereof, whereby the other associated banks were chargeable with any loss occasioned by the failure of the Keystone National Bank to pay. The other banks, therefore, had a prevailing equity to have applied to that debt money of their own which they paid into the clearing house under the circumstances as disclosed. How can the receiver object that, as the outcome of the settlement between the other banks, a balance from

funds which they provided was applied to the reduction of the debt due by his bank? Then, again, the receiver, who has no higher rights than his bank, is in a court of equity. Here he is met by the default of the bank in not paying into the clearing house the $47,029.75 it was bound to pay. He has not deemed it to be for the interest of his trust to pay that money. He does not propose to do so. How, then, can he ask a decree against the defendants for the $28,808.10? Obviously, to the extent of his bank's default, he is without equity.

For the reasons stated, we hold that the receiver has no good ground upon which to challenge the transactions in the clearing house. We add a single observation: As the right of set-off existed between the banks (Scott v. Armstrong, supra; Yardley v. Clothier, 51 Fed. 506, 2 C. C. A. 349), it is by no means clear that the other creditors of the Keystone National Bank would have fared better if the exchange had not taken place. With claims aggregating $117,035.21 as against claims for $70,005.46, it would seem improbable that anything would have been recoverable by the receiver.

Finally, the receiver does not show himself to be entitled here to equitable relief of any nature. The duebills for $41,197.36 are entirely out of the way. It does not appear that any items in the packages for $117,035.21 have been proved against the funds in the hands of the receiver, or have been presented to him for payment, or that any suit thereon has been brought or is threatened. If the receiver has the right to insist upon the formal cancellation of $28,808.10 of those items (which is the utmost he can claim), the present bill is not available to him to secure such decree. No such relief is here sought. The bill is not framed for that purpose. It is not apparent that the receiver needs the aid of a court of equity; but, if he is entitled to equitable relief, it is as against the other banks. Those banks are not parties to this suit.

The decree of the circuit court is reversed, and the case is remanded to that court with directions to dismiss the bill of complaint.

GREEN, District Judge, dissents.

BUTLER, District Judge (concurring). While I believe the foregoing opinion sufficiently vindicates the conclusion reached, I desire, in view of the dissent expressed, to add a few lines. It must be kept in mind that the suit is against certain individuals as the clearing house committee, and not against the banks involved in the exchange. If the latter did anything by which the plaintiff is aggrieved we cannot consider it here. The defendants are only liable for their own acts. These acts are those connected with the exchange of March 20, 1891. What were they? On the morning of that day the Keystone Bank delivered to their manager a package of its own obligations (received from other banks for cancellation) to be held as security for the payment of $47,000, which it had undertaken to pay by 12 o'clock that day. It did not pay; and as the value of the security depended upon holding the indorsers,

the committee, on being indemnified by the receipt of an equal sum of money from the other banks, handed the obligations over to them. On this state of facts what claim has the receiver on the committee? Until the $47,000 are paid by the Keystone or the receiver, neither has any right to the obligations; nor can either complain of the disposition made of them. When the money for which they are pledged is paid the receiver will be entitled to them, and the committee must then produce them, or account for their value. The bank did not pay the money, and the receiver will not, because it greatly exceeds the value of the obligations—which consist of promises of the broken bank, comparatively worthless. Their value is just the amount of the dividends they will draw if not redeemed. If the receiver redeems them he, or rather the creditors of the bank, will be benefited to the extent of the dividends thus saved—nothing more.

The fundamental error of the plaintiff consists in the assumption that the exchange of obligations was annulled by the subsequent transaction between the committee and the other banks—respecting which nothing need be added to what is said in the foregoing opinion. But if we concede this assumption the plaintiff will not be helped. The annulment of the exchange, if it bound the Keystone, might and doubtless would entitle the latter to a return of the $70,000 of obligations, which it had previously held. But it would not render the committee liable for their return. The committee never had nor saw them. But even conceding the committee's responsibility for their return, the assumption that it became liable to pay $70,000 for failure to return them is clearly erroneous. In such case the measure of damages would be the amount the receiver lost by such failure. This would be the value of the obligations to him and the creditors. Let us see what this is. The banks owing the obligations, held $117,000 of the Keystone's liabilities, which were a valid set-off. The receiver could not therefore recover a cent. The obligations nevertheless had some value, as they would extinguish $70,000 of the Keystone's liabilities, thus diminishing the claims against its assets that much; saving to the creditors the dividends which the $70,000 of obligations would draw if not canceled. This then is the loss from failure to return them. If the assets will pay 30 per cent. (which is very improbable), the dividends on $70,000 would be $21,000. Thus we see, even assuming that the exchange was annulled, and that the committee became responsible for the obligations, the receiver is not entitled to $70,000, as claimed and awarded. As the dividend rate is not ascertained we cannot know what (in this view) the receiver's loss is.

But the plaintiff further assumes that the clearing house received $70,000 for the Keystone Bank, in its transaction with the other banks, after the Keystone's failure. This assumption is wholly unwarranted. Nothing I think can be plainer than that the other banks did not pay any money to the committee for the Keystone, or its receiver. Why should they? What object could they have in doing so? They owed that bank nothing. On the contrary it owed them. Why therefore should they volunteer to pay the ob-

ligations it had held against them while they held its obligations (which were an available set-off), exceeding the amount in $47,000? In doing so they would simply throw away $70,000, (saving the inconsiderable sum that might be recovered back in dividends). It is clear that none of the money paid to the committee was intended for the Keystone, or inured to its benefit. It gave up nothing. Its rights under the exchange remain intact. When it pays its debt the obligations must be returned or their value accounted for. The object of the other banks in paying money to the committee is not clear, and we are not called upon to ascertain it. Why it was paid and what was done with it is unimportant. It was their own, to do with as they pleased. It was probably paid to settle balances among themselves. But whatever the object was, it is clear that it was not to benefit the Keystone Bank, and did not interest it. It is conceded that the object was to benefit themselves, alone.

The erroneousness of the decree may be illustrated by another statement. The Keystone Bank cannot claim to be placed in a better position than it occupied at the date of its failure, or to be benefited by its refusal to keep its contract and the action forced on the other banks thereby. Yet it is indisputable that the decree does place it in an infinitely better position—gives it, in effect, over $80,000 as a premium for its faithlessness. Let us see if this cannot be demonstrated. If the bank had kept its contract, it would have paid out $47,000, which would have been lost to the receiver and creditors—by diminishing the assets for distribution that much. It would then receive $117,000, not of money, but of its own nearly worthless obligations, for cancellation. The receipt of these obligations would have benefited the receiver and creditors just to the extent of the dividend the obligations would draw if not canceled. Now supposing the dividend rate to be 30 per cent. (which is doubtless much too high) the dividends on the $117,000 of obligations would be $35,100. To redeem and cancel them costs $47,000; deducting the $35,100 from this shows a loss to the receiver and creditors of $11,900, as the result of carrying out the contract. The receiver acted wisely therefore in not carrying it out; he saved $11,900. But because he did not carry it out and the committee and the other banks entered into the subsequent transaction on their own account, and for their own exclusive benefit, he is given an additional sum of $70,000; and is thus made a gainer in $81,900 by the failure to keep the contract. If the banks had intended to annul the exchange of obligations (which they could not do after the receiver's rights attached), they would of course have returned the obligations received by them from the Keystone, and set off against them the obligations of that bank which they held. To pay it, or for it, $70,000 in money, as it is alleged they did, would have been an act of folly incompatible with sanity. Of course nothing of the kind was intended or done.