**BURROWES v. NIMOCKS, County Treasurer.**

Circuit Court of Appeals, Fourth Circuit.
October 15, 1929.

No. 2848.

Northcott, Circuit Judge, dissenting.

J. O. Carr, of Wilmington, N. C., R. W. Herring, of Fayetteville, N. C., and George Rountree, of Wilmington, N. C. (Rountree & Carr, of Wilmington, N. C., on the brief), for appellant.

Robert H. Dye and J. Bayard Clark, both of Fayetteville, N. C. (V. C. Bullard and Dye & Clark, all of Fayetteville, N. C., on the brief), for appellee.

Before PARKER and NORTHCOTT, Circuit Judges, and SOPER, District Judge.

PARKER, Circuit Judge. This was a suit instituted by the receiver of the National Bank of Fayetteville, N. C., against the treasurer of Cumberland county, N. C., to determine the right to certain notes which had been transferred by the bank to the treasurer as security for the deposit of county funds. The transfer was attacked on two grounds: (1) That it had been made without authority from the board of directors of the bank; and (2) that it had been made in contemplation of insolvency and with a view of giving a preference to the treasurer, in contravention of section 5242 of the Revised Statutes, 12 USCA § 91. From a decree in favor of the treasurer, the receiver has appealed.

There is no controversy as to the material facts in the case. The National Bank of Fayetteville, for some time prior to May 1927, had carried funds on deposit for the treasurer of Cumberland county, but during that month the deposit was very small. Some time during the month, the treasurer notified one Tucker, the vice president of the bank, who was actively in charge of its affairs, that under a recent act of the Legislature a bond would be required to secure the county deposit. Tucker agreed that the bank would give the bond, but asked the treasurer to accept temporarily the transfer of notes as security until the bond could be obtained, promising to put up sufficient of these to give the treasurer a margin of 40 or 50 per cent. On account of the deposit being very small at that time, however, neither bond nor other security was given until some time later.

During the month of May, the county was negotiating the sale of a bond issue, and the directors of the bank, at a meeting held about May 20th, decided to try to obtain the proceeds of the bonds as a deposit. Tucker told them of the law requiring a bond to cover the deposit, and they sought same with knowledge of this requirement. The bond issue having been sold, the proceeds thereof, amounting to $1,109,951.25, were deposited in the bank on June 3d, and shortly thereafter, the treasurer again approached Tucker and requested that the security bond be given. Tucker took this up with some of the directors of the bank, and was instructed by them to see if he could not satisfy the treasurer by putting up notes as security for the deposit, being told to handle the matter in the best way that he could. He thereupon took the matter up with the treasurer, who agreed to accept the notes pending the obtaining of a bond. As it was understood that a large part of the deposit would be withdrawn within a very short while, it was thought that a considerable amount could be saved the bank in bond premiums if the giving of the bond were delayed. On July 11th, the board of county commissioners passed a resolution designating the bank as a county depository and requiring a bond of it, and shortly thereafter this resolution was called to the attention of the directors of the bank at one of their meet-

ings. Tucker reported to this meeting that he had satisfied the treasurer temporarily by putting up notes as security; and, while the matter was not formally passed on by the board, no disapproval was voiced as to what had been done and no action was taken towards giving a bond in lieu of putting up the notes.

Pursuant to his agreement with the treasurer, Tucker instructed the assistant cashier of the bank to get out notes and set them aside as security for the county deposit, and this was accordingly done. The notes so selected were put in a package to themselves with the name of the county treasurer placed thereon and with a rubber band around them. They were kept in the note file, but in a compartment separate from the other notes of the bank, and the assistant cashier was instructed to let the treasurer have them at any time he might ask for them. The treasurer saw them placed in a package and kept in this way with his name on them, but agreed that they might be kept at the bank for greater convenience in the transaction of its business. He also agreed that it might withdraw any of the notes at any time for collection or renewal on condition that others of equal value be substituted. Tucker instructed the assistant cashier to make a list of the notes thus set aside, and the work of listing them was commenced early in July and continued, as the assistant cashier had time to devote to the matter, until they were removed from the bank on August 4th and 8th. There is no evidence that the bank was insolvent or was thought to be insolvent at the time the notes were set aside under this agreement; and no contention is made that the notes were not set aside in good faith, that there was any fraud in the transaction, or that this setting aside was in contemplation of insolvency.

On August 4th, the treasurer came to the bank and demanded the securities which had been set aside for him; and all which had been listed at that time, amounting to $426,631.86, were turned over to him. Others, amounting to $40,189.79, were listed and delivered to him on August 8th. Shortly after this last transaction, the bank closed its doors. The deposit standing to the credit of the treasurer at that time was $341,000.24. On the question of the solvency of the bank, as heretofore stated, there is no evidence showing that it was insolvent at the time the securities were set aside for the treasurer. As to its solvency at the time of the actual delivery of the securities, it appears that some time in July the treasurer had notified it that he would withdraw $200,000 of his deposit on August 3d, and it had arranged to meet this withdrawal. A few days beforehand, however, he discovered that other obligations of the county would mature on August 3d, amounting to around $180,000, and notified it that the withdrawal would be $380,000 instead of $200,000. The bank thereupon had him obtain an extension of this $180,000 until August 8th, and endeavored to secure the funds to meet same. The $200,000 withdrawal was met on August 3d, but funds to meet the $180,000 could not be secured, and failure to secure same caused the closing of the bank on the 8th. This failure to meet the withdrawal of funds is the only evidence of insolvency, other than the testimony of the receiver that the bank was insolvent when he took charge; and the fact that the officers of the bank must have known that it would be obliged to close its doors unless funds were raised to meet the withdrawal is the only evidence which would justify a finding that there was any contemplation of insolvency at any time prior to the actual closing.

■ The first contention of the receiver is that the setting aside or pledging of the notes as security for the county deposit was void because not authorized by the directors and beyond the power of the vice president. We do not think, however, that this position can be sustained either on the facts or as a matter of law. The deposit of county funds was not an ordinary general deposit, but one which under the law must be secured. It was more nearly analogous to a call loan than to an ordinary deposit. The vice president was expressly authorized to seek it; and this authority carried by necessary implication the power to give the security necessary to obtain it. It seems clear that the pledging of notes as temporary security pending the reduction of the deposit so as to save premiums on a large bond, for which indemnifying security would in all probability have been required in any event, was a reasonable exercise of the authority. At all events, the acquiescence of the board of directors in what had been done, when the matter was called to their attention at a meeting of the board, was a sufficient ratification, if ratification were needed. Armstrong v. Chemical National Bank (C. C. A. 6th) 83 F. 556, 574, 575; Kissam v. Anderson, 145 U. S. 435, 12 S. Ct. 960, 36 L. Ed. 765; 7 C. J. 538.

■ In addition to this, the active vice president, as managing officer of the bank, had the authority within himself, without special authorization, to obtain what was in effect a loan to the bank, and to pledge notes which it held, as security therefor. The rule is well

settled that the executive officer of a bank may, in the usual course of business, and without special authority, rediscount its paper or otherwise borrow money for its use. Cherry v. City Nat. Bank (C. C. A. 8th) 144 F. 587, 590; Page Trust Co. v. Rose, 192 N. C. 673, 135 S. E. 795, 798; Citizens' Bank v. Bank of Waddy, 126 Ky. 169, 103 S. W. 249, 11 L. R. A. (N. S.) 598, 128 Am. St. Rep. 282; Davenport v. Stone, 104 Mich. 521, 62 N. W. 722, 53 Am. St. Rep. 467; Richards, County Treasurer, v. Osceola Bank, 79 Iowa, 707, 45 N. W. 294; Ward v. Johnson, 95 Ill. 215, 3 R. C. L. 450.

The case of Page Trust Co. v. Rose, supra, is practically "on all fours" with the case at bar. In that case county funds were deposited in the bank and a bond required. To obtain the bond, the vice president and cashier, without special authority from the board of directors, assigned certain notes of the bank to the sureties on the bond, to secure them for signing same. The bank became insolvent, and a controversy arose as to whether the sureties or the receiver of the bank was entitled to the notes so assigned; the assignment being attacked on the ground that the vice president and cashier was without authority to make same. The court, speaking through Mr. Justice Connor, upheld the assignment, saying: "The transactions out of which the subject-matter of this controversy arose, to wit, the execution and delivery of the bond, authorized by statute, and the transfer and assignment of the notes belonging to the bank, for the purpose of indemnifying the sureties of the bank, on its bond, were valid. The vice president and cashier had the power, without special authority of the board of directors, to execute the bond, and to transfer and assign the notes, to be held solely for the purpose of saving harmless the sureties on the bond."

We come, then, to the question as to whether the pledge of the notes to the county treasurer is void under section 5242 of the Revised Statutes, 12 USCA § 91; and this question also, we think, must be answered in the negative. If we were at liberty to confine our attention to the circumstances surrounding the actual deliveries of the notes to the treasurer on August 4th and 8th, we might conclude that there was sufficient evidence that the officers of the bank were apprehensive of insolvency at that time and the transfers might be treated as made in contemplation of insolvency and with the view of giving a preference. But consideration must also be given to what preceded delivery—that is, to the agreement to set aside the notes as security, and to the fact that they were actually set aside, segregated, and marked as such in good faith at a time when there was no question as to the solvency of the bank. When these are considered, it is clear that prior to the actual delivery to the treasurer, there had been created an equitable pledge which was good, in equity, between the parties, and that, when the delivery occurred, it related back to the original contract of pledge and rendered it valid at law, not only as between the parties themselves, but also as against all persons who had not in the meantime acquired title to or a lien upon the subject of pledge.

The doctrine of equitable pledge is well stated in 31 Cyc. 797, as follows: "Where there is a contract for a pledge, which, however, does not constitute a valid pledge because of the lack of some requisite, as the non existence of the property to be pledged, or a want of delivery, the contract is said to create an equitable pledge, which a court of equity will enforce between the parties and against the general creditors of the pledgor, but not against subsequent bona fide purchasers or pledgers for value."

The doctrine with its reasons and limitations is thus stated by Prof. Pomeroy, 3 Pomeroy's Equity (4th Ed.) § 1235: "The doctrine may be stated in its most general form, that every express executory agreement in writing, whereby the contracting party sufficiently indicates an intention to make some particular property, real or personal, or fund, therein described or identified, a security for a debt or other obligation, or whereby the party promises to convey or assign or transfer the property as security, creates an equitable lien upon the property so indicated, which is enforceable against the property in the hands not only of the original contractor, but of his heirs, administrators, executors, voluntary assignees, and purchasers or encumbrancers with notice. Under like circumstances, a merely verbal agreement may create a similar lien upon personal property. The ultimate grounds and motives of this doctrine are explained in the preceding section; but the doctrine itself is clearly an application of the maxim, equity regards as done that which ought to be done. In order, however, that a lien may arise in pursuance of this doctrine, the agreement must deal with some particular property, either by identifying it, or by so describing it that it can be identified, and must indicate with sufficient clearness an intent that the property so described, or ren-

dered capable of identification, is to be held, given, or transferred as security for the obligation."

And, among the agreements giving rise to an equitable lien, Prof. Pomeroy, in § 1237, includes "Executory agreements which do not convey or transfer any legal estate in the property, but which stipulate that the property shall be security, or which pledge it, for the performance of an obligation." And, in concluding the section in which many examples of equitable liens are given, he says: "The foregoing instances are sufficient to illustrate the doctrine of equitable lien arising from express contract. They show that the form is immaterial, if the intent appears to make any identified property a security for the fulfillment of an obligation." See, also, Walker v. Brown, 165 U. S. 654, 17 S. Ct. 453, 41 L. Ed. 865; Chattanooga Nat. Bank v. Rome Iron Co. (C. C.) 102 F. 755, 758 (in both of which the rule as stated by Prof. Pomeroy is quoted with approval); Hook v. Ayers (C. C. A. 7th) 80 F. 978, 982; Garrison v. Vermont Mills, 154 N. C. 1, 69 S. E. 743, 31 L. R. A. (N. S.) 450; Godwin v. Murchison Nat. Bank, 145 N. C. 320, 59 S. E. 154, 17 L. R. A. (N. S.) 935; Houston Nat. Exch. Bank v. Gregg County (Tex. Civ. App.) 202 S. W. 805; Chapman v. Johnson (Tex. Civ. App.) 261 S. W. 470; Fletcher American Nat. Bank v. McDermid, 76 Ind. App. 150, 128 N. E. 685; Jones on Pledges, § 28.

Under the facts here, there can be no question that an equitable pledge or lien was created in favor of the county treasurer with respect to the notes which were segregated and set aside for his security. There was an agreement, upon a sufficient consideration, providing that the notes should be held as security for the county deposit. The notes, upon being segregated under the agreement, were clearly identified as covered by its terms. And it was clearly provided, if the uncontradicted evidence is to be believed, not only that they were to be held by the bank as security for the deposit of the county, but also that they should be delivered to the county treasurer upon his demand at any time. True, there was a right of substitution on the part of the bank, but, as in Sexton v. Kessler, 225 U. S. 90, 32 S. Ct. 657, 56 L. Ed. 995, to which we shall refer at greater length hereafter, this right of substitution was limited by the agreement. The bank had the right to withdraw a note only upon putting up another of equal value. Under the authorities above cited, the treasurer had a lien upon the notes thus set aside for him, which was good, not only as against the bank, but also as against its creditors and all other persons, except bona fide purchasers and such persons as might have acquired rights in or liens upon the notes themselves.

■ But, in addition to the fact that the treasurer had an equitable lien or pledge on the notes which was good in equity against the bank and its receiver and not voidable under Rev. St. § 5242, 12 USCA § 91, because created when there was no suspicion of insolvency, we think that he held them under pledge which was valid at law and not voidable under Rev. St. § 5242, because the delivery, although made when the bank was on the verge of insolvency, must be held to relate back to the original agreement under which the notes were segregated. It is true that a pledge is not good at law without delivery; but the doctrine is well established in North Carolina and elsewhere that the delivery need not be contemporaneous with the contract of pledge. If made subsequently, it relates back to the contract and gives it validity. Garrison v. Vermont Mills, supra; Godwin v. Murchison Nat. Bank, supra; Virginia-Carolina Chemical Co. v. McNair, 139 N. C. 326, 51 S. E. 949; Mills v. Virginia-Carolina Lumber Co. (C. C. A. 4th) 164 F. 168, 21 L. R. A. (N. S.) 901; Tomlinson v. Bank (C. C. A. 4th) 145 F. 824; Parshall v. Eggert, 54 N. Y. 18; Cartwright v. Wilmerding, 24 N. Y. 521, 533, 534; Ackerson v. Babcock, 132 Wash. 435, 232 P. 335; American Pig Iron Co. v. German, 126 Ala. 194, 28 So. 603, 85 Am. St. Rep. 21, 26; Farmers' Nat. Bank v. Cravens, 93 Okl. 58, 219 P. 138; 21 R. C. L. 644; 31 Cyc. 803; Jones on Pledges, §§ 38 and 39.

In the oft-cited case of Parshall v. Eggert, 54 N. Y. 18, a debtor had pledged certain middlings and bran as security for his note, executing to his creditor a receipt showing that he held them in store for the account of the creditor. Subsequently he absconded, and the creditor obtained possession from his clerk. It was held that the possession so obtained validated the pledge, and that same was good against the rights of a creditor who subsequently attempted to levy an attachment upon the property. The court said: "I know of no authority denying the right of a party who has a contract for a pledge, ineffectual for want of delivery, to obtain a delivery at a subsequent time, and thus to validate the pledge. Upon general principles, the only obstacle which can prevent such a transaction from being effectual, must be the intervention of fraud." And further: "In the absence of any intermediate right, the par-

ties could perfect a written contract of pledge by subsequent delivery. Even between successive pledgees, without any communication with each other, that one who lawfully obtains possession, at the time of the pledge or subsequently, is entitled to be preferred. * * * A creditor who acquires a specific right to or lien on the thing pledged, may prevent the pledgee's interest in an undelivered chattel from attaching. But such is not the condition of the creditor at large. The only ground on which he can claim to prevent the perfecting of such a right in the pledgee is that it works a fraud upon him."

And the rule is thus stated in Jones on Pledges, § 38: "A pledge or contract for a pledge, ineffectual for want of delivery, may be rendered valid by a subsequent delivery, even as against an intermediate creditor at large of the pledgor. Of course, such subsequent delivery would not prevail against a creditor who had, between the time of the making of the contract and taking possession under it, acquired a specific lien upon the thing pledged by attachment or levy of execution. The only other obstacle which could prevent such a transaction from being effectual would be the intervention of fraud."

A case directly in point, from which we think that the case at bar cannot be distinguished either on the facts or the principles involved, is Sexton v. Kessler, 225 U. S. 90, 32 S. Ct. 657, 658, 56 L. Ed. 995; Id. (C. C. A.) in 172 F. 535, 40 L. R. A. (N. S.) 639. In that case a firm of private bankers in New York, some years before its failure, agreed with defendant, its Manchester correspondent, to put aside securities to protect its indebtedness to defendant. In accordance with this agreement, certain securities consisting of stocks and bonds were placed in a package marked "Escrow for account of Kessler & Co., Limited, Manchester," which was kept in the vaults of the New York firm. A list of the securities was sent defendant; and it was agreed that the New York firm, without consulting defendant, might withdraw and sell any of the securities at any time upon replacing them with others of equal value. Within four months prior to the bankruptcy of the New York firm, and while its solvency was in doubt, it delivered the securities to an agent of the Manchester firm. After bankruptcy, suit was instituted by the trustee to recover them on the ground that their transfer within four months of bankruptcy constituted a preference in violation of the Bankruptcy Act (11 USCA). The right of the defendant in the securities was sustained on the ground that it had acquired right thereto under the original contract and setting aside by the bankrupt, and that consequently the delivery within four months of the bankruptcy did not constitute a voidable preference.

In the Circuit Court of Appeals of the Second Circuit, the case was heard before Judges Lacombe, Ward, and Noyes, all of whom agreed that the claim of the defendant to the securities should be sustained. The majority of the court, composed of Judges Lacombe and Noyes, in an opinion by Judge Noyes (172 F. 539, 544, 545, 40 L. R. A. [N. S.] 639), held that the rights of the defendant were perfected as against creditors by the delivery and that same related back to the original transaction, under which the securities were set aside, and validated it as a pledge. They held, further, that the perfecting of the lien of the pledge by the delivery could not under the circumstances be held the giving of a preference, relying upon Thompson v. Fairbanks, 196 U. S. 516, 25 S. Ct. 306, 49 L. Ed. 577, and Humphrey v. Tatman, 198 U. S. 91, 25 S. Ct. 567, 49 L. Ed. 956, to support this conclusion. Judge Noyes said, with reference to these cases: "While the Supreme Court in the cases referred to treats the validity of the mortgages and the rights of the mortgagees thereunder to be matters of local law, in my opinion it also states this underlying and controlling distinction: The exercise of a pre-existing right well founded in equity is not a preference, although occurring within the prescribed period."

Judge Ward held that the agreement of the parties amounted to a declaration of trust in favor of defendant, which vested in it the equitable title to the securities.

In the Supreme Court, the decision of the Circuit Court of Appeals was affirmed; the court saying, through Mr. Justice Holmes:

"So far as the interpretation of the transaction is concerned, it seems to us that there is only one fair way to deal with it. The parties were business men, acting without lawyers, and in good faith attempting to create a present security out of specified bonds and stocks. Their conduct should be construed as adopting whatever method consistent with the facts and with the rights reserved is most fitted to accomplish the result. If an express declaration of an equitable lien, or, again, a statement that the New York firm constituted itself the servant of the English company to maintain possession for the latter, or that it held upon certain trusts, or that a mortgage was intended,

or any other form of words, would effect what the parties meant, we may assume that it was within the import of what was done, written, and said. * * *

"The transaction was not void as against creditors, irrespective of attachment, as in Knapp v. Milwaukee Trust Co., 216 U. S. 545, 30 S. Ct. 412, 54 L. Ed. 610; Niles v. Mathusa, 162 N. Y. 546, 57 N. E. 184. There can be no doubt, as was said by the court below, that before the bankruptcy the English house had an equitable right, at least, to possession *if it wanted it.* While the phrase 'equitable lien' may not carry the reasoning further or do much more than express the opinion of the court that the facts give a priority to the party said to have it, we are of opinion that the agreement created such a lien at least; or, in other words, that there is no rule of local or general law that takes from the transaction the effect it was intended to produce. Hurley v. Atchison, T. & S. F. R. Co., 213 U. S. 126, 134, 29 S. Ct. 466, 53 L. Ed. 729, 734. When the English firm took the securities, it only exercised a right that had been created long before the bankruptcy, and in good faith. Such we understand to be the law of New York; *and in the absence of any controlling statute to the contrary, such we understand to be what the law should be.* Parshall v. Eggert, 54 N. Y. 18; National Bank of Deposit v. Rogers, 166 N. Y. 380, 59 N. E. 922." (Italics ours.)

With respect to the contention that the right of the bankrupt to withdraw and sell securities was such dominion over them as to negative any lien in the defendant, the court said: "The most obvious objection is that the continued physical power of the New York firm over the securities, and its right to withdraw and substitute, admittedly reserved, are inconsistent with a title or lien of the English house in any form. But the decisions of this court and of New York agree that there may be title in a stronger case than this. When a broker agrees to carry stock for a customer, he may buy stocks to fill several orders in a lump; he may increase his single purchase by stock of the same kind that he wants for himself; he may pledge the whole block thus purchased for what sum he likes, or deliver it all in satisfaction of later orders, and he may satisfy the earlier customer with any stock that he has on hand, or that he buys when the time for delivery comes. Yet, as he is bound to keep stock enough to satisfy his contracts, as the New York firm in this case was bound to substitute other security if it withdrew any, the customer is held to have such an interest that a delivery to him by an insolvent broker is not a preference. Richardson v. Shaw, 209 U. S. 365, 28 S. Ct. 512, 52 L. Ed. 835, 14 Ann. Cas. 981; Markham v. Jaudon, 41 N. Y. 235. So, a depositor in a grain elevator may have a property in grain in a certain elevator, although the keeper is at liberty to mix his own or other grain with the deposit, and empty and refill the receptacle twenty times before making good his receipt to the depositor concerned."

Counsel for the receiver rely particularly upon Casey v. Cavaroc, 96 U. S. 467, 24 L. Ed. 779, and Casey v. National Park Bank, 96 U. S. 492, 24 L. Ed. 789, the facts of which are very similar to the case at bar, although not so similar, we think, as those in Sexton v. Kessler. In these two cases, however, there was no delivery of the securities until after the closing of the bank, and consequently no perfecting of the pledge before the rights of creditors had attached to the bank's assets. Furthermore, the defendants in those cases relied upon the doctrine of pledge, and the question as to whether the securities were subject to a lien in equity seems not to have been considered. The court said, in the Cavaroc Case: "It must not be overlooked that the Credit Mobilier has no other claim to the securities in question but that of pledge."

The cases of Benedict v. Ratner, 268 U. S. 353, 45 S. Ct. 566, 69 L. Ed. 991, and Union Trust Co. v. Peck (C. C. A. 4th) 16 F. (2d) 986, are not in point. Both of those cases dealt with assignments of accounts where the assignor reserved the unconditional right, notwithstanding the assignment, to collect the accounts and mingle the proceeds of collection with his general assets; and it was held that the retention of such unfettered dominion precluded the effective creation of a lien. Here, however, as in Sexton v. Kessler, the right to withdraw securities set aside for the protection of the treasurer, was conditioned upon the substitution of other securities of equal value. The bank therefore did not have unfettered dominion over them. The distinction was pointed out by Mr. Justice Holmes in the Kessler Case, 225 U. S. at page 98, 32 S. Ct. 657, 56 L. Ed. 995, and by Mr. Justice Brandeis in the Ratner Case, 268 U. S. at page 364, 45 S. Ct. 566, 69 L. Ed. 991.

But one question remains for discussion: Is there anything in the statute relied upon by the receiver (Rev. St. § 5242, 12 USCA § 91) which invalidates as to him the equitable lien or pledge, created by the con-

tract and setting aside of securities, or which invalidates the delivery after insolvency, by which the contract of pledge theretofore made was validated at law? We think not. The statute merely avoids preferential transfers made in contemplation of insolvency. It does not constitute the receiver a purchaser for value or give him any lien upon property in the possession of the insolvent bank. On the contrary, it is expressly held that he takes the assets of such bank subject to all claims and defenses which might have been asserted against it, and that he has no greater rights in its property than it had. Fourth St. Bank v. Yardley, 165 U. S. 634, 653, 17 S. Ct. 439, 41 L. Ed. 855; Scott v. Armstrong, 146 U. S. 499, 507, 13 S. Ct. 148, 151, 36 L. Ed. 1059; Yardley v. Philler (C. C. A.) 62 F. 645, 25 L. R. A. 824. In Scott v. Armstrong, the court, speaking through Chief Justice Fuller, said: "Undoubtedly any disposition by a national bank, being insolvent or in contemplation of insolvency, of its choses in action, securities, or other assets, made to prevent their application to the payment of its circulating notes, or to prefer one creditor to another, is forbidden; but liens, equities, or rights arising by express agreement, or implied from the nature of the dealings between the parties, or by operation of law, prior to insolvency and not in contemplation thereof, are not invalidated. The provisions of the act are not directed against all liens, securities, pledges, or equities, whereby one creditor may obtain a greater payment than another, but against those given or arising after or in contemplation of insolvency."

In Stapylton v. Stockton (C. C. A. 5th) 91 F. 326, it was held that an unrecorded mortgage, good between the parties but not as against creditors until recorded, would not be held to be a preferential transfer, where given when the bank was supposed to be solvent, although not recorded until the day on which it closed its doors.

A trustee in bankruptcy, since the amendment of 1910 to the Bankruptcy Act (11 USCA), has greater rights in the property of the bankrupt than has the receiver of a national bank, for as to such property he is given the rights of a creditor holding a lien by legal or equitable proceedings on property coming into his possession and the right of a judgment creditor with an execution returned unsatisfied as to other property. Nevertheless, it is the settled rule in bankruptcy that, where a lien is good as between the parties, but, because of lack of registration or possession, not good against lien creditors, its registration, or in a proper case the taking of possession of the property, before bankruptcy, will render it valid as against the trustee in bankruptcy, and will not be held to be the obtaining of a preference. Finance & Guaranty Co. v. Oppenhimer, 276 U. S. 10, 48 S. Ct. 209, 72 L. Ed. 443; Bailey v. Baker Ice Machine Co., 239 U. S. 268, 36 S. Ct. 50, 60 L. Ed. 275; Humphrey v. Tatman, 198 U. S. 91, 25 S. Ct. 567, 49 L. Ed. 956; Thompson v. Fairbanks, 196 U. S. 516, 25 S. Ct. 306, 49 L. Ed. 577; Firestone Tire & Rubber Co. v. Cross (C. C. A. 4th) 17 F.(2d) 417. In the Oppenhimer Case, the Supreme Court said: "A party holding security does not create a preference by taking possession under it within four months if he lawfully may under the law of the state." Upon the same principle, we think, a creditor of a national bank holding a lien upon securities does not create a preference within the meaning of the statute by taking them into his possession.

It is, of course, the duty of the court, in a case of insolvency, where reliance is placed upon an equitable lien, to scrutinize the evidence with great care; but a careful examination of the record before us fails to disclose any evidence of fraud. On the contrary, counsel for the receiver concede that, at the time the agreement was made and the notes were segregated and set aside thereunder, there was no apprehension of insolvency. It appears, furthermore, that the county funds were deposited and later left with the bank upon the understanding that sufficient of its notes were to be assigned as security for same; and consequently the bank must be held to have received and retained general assets as a result of the agreement to pledge the notes in an amount equal to the lien created upon the notes affected thereby. There is no showing that any creditor of the bank has been misled or could have been misled as to its financial condition by reason of the lien created; and there was no such unreserved dominion retained over the notes as was inconsistent with the lien, as in Benedict v. Ratner, supra. Although some of the notes were listed and delivered after others, there is no controversy as to the fact that all of them were set aside for the security of the treasurer before any question was raised as to the solvency of the bank. If it appeared that any of them were set aside after the officers of the bank were contemplating insolvency, a different question as to the particular notes so set aside would be presented. On the record before us, the de-

cree of the learned District Judge was correct, and should be affirmed.

Affirmed.

NORTHCOTT, Circuit Judge, dissents.