### SEXTON v. KESSLER & CO., Limited. et al.

(Circuit Court of Appeals, Second Circuit.   May 14, 1909.)

### No. 263.

BANKRUPCY (§ 163*)—VOIDABLE PREFERENCES—TRANSFER OF PROPERTY—DELIVERY PURSUANT TO PRIOR LIEN.

A New York banking house, by agreement, and in order to provide security for drafts drawn by it in the course of business on its correspondent in Manchester, England, placed certain stocks and bonds either transferable by delivery or indorsed in blank in an envelope in its safe deposit vaults marked "Escrow, for account of" the Manchester house, which was furnished with a list of the securities giving their market value. The New York house also entered the transfers on its books and with permission of the Manchester house, from time to time, withdrew certain of the securities and substituted others of equal value. The arrangement was made in entire good faith and continued for a number of years, when the New York house, having then outstanding unprotected drafts, and its condition having become uncertain by reason of a panic, delivered the securities to an agent of the Manchester house and within four months thereafter was adjudged a bankrupt. *Held:* That the Manchester house had an equitable lien on the securities while in the possession of its debtor in the nature both of a mortgage and an agreement for a pledge which gave it the right to take possession of the same at any time; that, when it took possession, it did so by virtue of such prior right, and its title was that of mortgagee and pledgee, relating back to the time of the original transaction, and did not constitute a transfer of property within four months of the bankruptcy, which could be avoided as a preference under Bankr. Act July 1, 1898, c. 541, § 60b, 30 Stat. 562 (U. S. Comp. St. 1901, p. 3445).

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 163.*]

Appeal from the District Court of the United States for the Southern District of New York.

See, also, 165 Fed. 508.

McLaughlin, Russell, Coe & Sprague (Abram I. Elkus, Frederick C. McLaughlin, and Rufus W. Sprague, Jr., of counsel), for appellants.

John Larkin and J. Frankenheimer, for appellee.

Before LACOMBE, WARD, and NOYES, Circuit Judges.

WARD, Circuit Judge.   Kessler & Co., of New York, engaged in the business of banking and foreign exchange, had for a long time drawn upon Kessler & Co., Ltd., of Manchester, without giving any

security for payment of its drafts. Early in 1903 the Manchester house wrote the New York house as follows:

"We beg to refer to the question of your providing security for the drawing credit which you have with us, which has already been privately touched upon. We understand from Mr. Edward Kessler that it would not be very convenient for you to provide this immediately, and as we in no way wish to incommode you, although from the altered circumstances of this firm it is a matter of some importance to us, we propose to give you until the 30th of June of this year, by which date the necessary securities should be set aside for us and a list sent to us. We do not propose to name a fixed amount of credit. Suffice it to say that what you are at present using seems large, and rather than an increase we should like to see it somewhat reduced.

"We trust that you may be able to give effect to our wishes even sooner than the date we stipulate for."

In accordance with this letter the New York house, on June 30th, wrote the Manchester house:

"In accordance with instructions from Mr. Alfred Kessler, we have to-day placed in a separate package in our safe deposit vaults the following securities, package marked 'Escrow for account of Kessler & Co., Limited, Manchester':

| | |
|---|---|
| 1,484 shares Oklahoma Gas & Electric Co., at 25 | $ 37,100 |
| 2,428 shares United Lighting & Heating Co., at 12 | 29,136 |
| 2,352 shares Daimler Manufacturing Co., at 50 | 117,600 |
| $373,000 United Breweries Co. first 6's, at 65 | 242,245 |
| | $406,081 |

"This escrow is intended as a protection against our long drawings against your good selves."

July 8th the Manchester house replied as follows:

"We are in receipt of your favor of 30th ultimo, in which you advise us of the securities you have laid aside as security for your long drawings on us. We have noted the particulars as given up to us and the matter goes in order. If at any time you have the opportunity of realizing these securities or any part of them, you are at liberty to take them and to replace them by others of equal value, though in that case we should of course like to see rather better quality."

December 23, 1903, the Manchester house wrote to the New York house as follows:

"For the purpose of the audit of our books for our yearly balance sheet, we should feel obliged if you would send us, in the form of a certificate, the particulars of the securities you have set aside against your drawing credit with us. We should like this done annually on the 31st December. We do not think the matter will present any difficulty for you. Something in the form of the inclosed is what we require. * * * We certify that we have specially set aside and hold for your acct. on this, the 31st day of December, '03, as security for the drawing credit which you accord us, the following securities: * * * Name secs. and market value."

The New York house not only conformed to these directions, but, in addition, entered the securities so set aside and all substitutions of them on their loan book and notified the Manchester house of substitutions made from time to time. The securities were always either negotiable by delivery or indorsed in blank. The two houses did business in strict conformity with the foregoing arrangement until the fall of 1907, when a financial panic occurred in the city of New York. October 25th the stability of the New York house being in doubt, it de-

livered to an agent of the Manchester house then in New York City the escrow securities, which he deposited in a safe deposit company in the name of the Manchester house. November 8th a petition in bankruptcy was filed against the New York house, and November 27th it was adjudicated a bankrupt.

This is an action in equity brought by the trustee in bankruptcy to set aside the transfer of the securities because made within four months prior to the filing of the petition; the New York house being insolvent, and the Manchester house knowing, or having reason to know, that fact, and the intention being to give it a preference. The matter was referred to a master, who found in accordance with the prayer of the bill, and his report was confirmed by the district judge, from whose decree this appeal is taken.

The master and the district judge both held the transaction in question to be a pledge or an agreement to pledge the escrow securities, and that the delivery of them under the circumstances stated in the bill within four months of the filing of the petition in bankruptcy constituted a voidable preference under the bankrupt act. It may be admitted that the conclusion so reached was entirely right if the arrangement is to be regarded as a pledge or a promise to pledge; possession being essential to the existence of a pledge. This relieves us from the necessity of examining authorities relating to pledges. A word, however, may be said as to the cases of Casey v. Cavaroc, 96 U. S. 467, 34 L. Ed. 779, Casey v. National Bank, 96 U. S. 492, 24 L. Ed. 789, and Casey v. Schuchardt. 96 U. S. 494, 24 L. Ed. 790, upon which the appellant especially relies. In the second case a receipt was given by the bank which might have been treated as a declaration of trust; but the defendant relied on its rights as a pledgee. What Mr. Justice Bradley said in the last case was undoubtedly true of all the cases:

"As the only claim made by Schuchardt & Sons in their answer to the securities in question is by way of pledge, and as there was no such delivery and retention of possession by them or their agents or trustees as the law requires to constitute the privilege of a pledge as to third persons, their claim cannot be sustained."

The intention to secure is plain; but this could have been accomplished not only by a pledge, which is the usual course of business in case of choses in action, but by a mortgage or by a trust. It can hardly be doubted that a formally executed declaration of trust as to specific securities by the New York house in favor of the Manchester house would have been good. The New York house, although the maker of the trust, could have properly acted as the trustee (Locke v. Trust Co., 140 N. Y. 135, 35 N. E. 578), to the extent of the trust, viz., the protection of the Manchester house for its acceptances.

As the transaction was a perfectly honest one, a construction should be adopted to give it effect, if that is possible. In their correspondence the parties used neither the words "mortgage," nor "pledge," nor "trust," but the inapt word "escrow," which they probably did not understand. What they did, however, clearly evidences their intention. The credit to be given to the New York house was not to depend alone upon its strength, but also upon additional security to be given to the Manchester house. The New York house, being the absolute owner

of certain specified securities, agreed, in accordance with the requirement of the Manchester house, to hold them for its account, and to that end both segregated them from their other securities and entered them upon their books as so appropriated. The Manchester house as the equitable owners authorized the New York house to withdraw the specified securities from time to time for their own purposes not absolutely, but upon condition that they should substitute securities of equal value, which was always done. There were, accordingly, during the whole period of this credit, specified earmarked or traceable securities held by the New York house for account of the Manchester house. The use of the word "collateral" does not necessarily indicate a pledge. It is important only as showing that the Manchester house's ownership of or interest in the securities was only for the purpose of protecting it for accepting the drafts of the New York house.

Considering the family relation and the long business dealing between the two houses, and the fact that they were dealing 3,000 miles apart, and that they had entire confidence in each other, the arrangement made was natural and reasonable. It was sufficiently precise to protect the Manchester house and elastic enough to meet the ordinary requirements of the business of the New York house.

If the transaction had been a mortgage of the securities, the delivery of them October 25, 1907, would have been good as against the trustee in bankruptcy because under the law of the state of New York mortgages of choses in action need not be filed. Lien Law (Laws 1897, p. 536, c. 418) § 90; Humphrey v. Tatman, 198 U. S. 91, 25 Sup. Ct. 567, 49 L. Ed. 956. Doubtless a court of equity would not intervene to enforce or perfect an imperfect mortgage as against the other creditors of the mortgagor; but no such assistance would have been needed, the mortgagor having voluntarily carried out the purpose of the mortgage by delivering the securities to the mortgagee. This would have been legal, notwithstanding the insolvency of the mortgagor and the knowledge of that fact by the mortgagee. Hauselt v. Harrison, 105 U. S. 401, 26 L. Ed. 1075; Wood v. U. S. Fidelity Co. (D. C.) 143 Fed. 424.

So in the case of trust receipts the courts of New York have been astute to carry out the intention of the parties. The course of business is as follows: A banker gives a letter of credit to the purchaser of goods to enable him to pay for them upon condition that bills of lading to the banker's order for the goods shall be delivered to him, accompanied by a draft upon the purchaser. Upon arrival of the goods the banker delivers the bill of lading to the borrower; he executing a trust receipt to hold or sell the goods as the property of the banker for his benefit. Without defining exactly what the relation between the lender and the borrower is as to the goods—that is, whether it is that of mortgagor and mortgagee or of pledgor and pledgee, or a conditional sale—the courts have steadily protected the right of the lender in the goods so delivered. Farmers' & Mechanics' Bank v. Logan, 74 N. Y. 568; Moors v. Kidder, 106 N. Y. 32, 12 N. E. 818; Drexel v. Pease, 133 N. Y. 129, 30 N. E. 732.

We regard the transaction in question as a declaration of trust in respect to the escrow securities by the New York house in favor of the Manchester house. Being the absolute owner of the securities, it

declared in consideration of its right to draw that it held and would hold the same and all securities subsequently substituted therefor for the benefit of the Manchester house. From that moment the legal title was in the New York house, but the equitable in the Manchester house; the New York house holding the securities in a fiduciary capacity. This was the condition on which the Manchester house gave the drawing credit which continued for several years, and it was because of its ownership that its authority to substitute securities was needed and was given.

We do not apprehend that this conclusion will result in the consequences foretold by the appellee. The public was not giving credit to the New York house on the strength of its apparent ownership of these securities because it knew nothing at all about them. The visible possession of chattels apparently owned by the possessor creates a wholly different situation. In respect to such property the law prohibits secret liens as against creditors. Yet ownership of chattels where there has been no change of possession will be protected if they are set apart and marked and in this way notice given to the public. First National Bank v. Pennsylvania Trust Co., 124 Fed. 968, 60 C. C. A. 100. There was, however, as to the securities under consideration, no secrecy which was not inherent in their nature. The public does not know what stocks, bonds, or notes a merchant has, and therefore does not give him credit because of them. There is no evidence that any exhibition of or statement as to these securities was made to any one by the New York house for the purpose of obtaining credit. Their books, if examined, would have shown what the real dealing between them and the Manchester house was.

If there had been no insolvency, and the New York house had withdrawn securities without substituting others, a court of equity would have compelled it to do so, or at least would have enjoined it from making such withdrawals, at the suit of the Manchester house. If, having failed to cover its drafts, the New York house had refused to deliver the securities to the Manchester house, a court of equity would have compelled it to do so. In delivering the securities to the Manchester house October 25, 1907, the New York house acted without the compulsion of a court of equity in strict accordance with the trust it had declared four years before, when entirely solvent. For the first time in that course of dealing there was an expectation that the New York house would not cover its drafts; that the Manchester house would have to pay them and would need to realize upon the securities which the New York house held for its protection. No new right or privilege was then created voidable under the bankrupt act. The delivery of these earmarked securities was in strict pursuance of the agreement made long before on the strength of which the credit was given. Sabin v. Camp (C. C.) 98 Fed. 974, cited with approval in Thompson v. Fairbanks, 196 U. S. 516, 524, 25 Sup. Ct. 306, 49 L. Ed. 577. A liberal construction should be given to these transactions in aid of the obvious intention of the parties.

The decree of the court below is reversed with costs.

NOYES, Circuit Judge (concurring). While I concur in the result reached by Judge WARD, I am constrained to base my conclusions

upon essentially different grounds; and the case is of such importance, both on account of the amount in controversy and the principles involved, that a separate opinion seems called for.

In considering the case from any point of view, one thing is apparent from the outset, and that is the good faith of the parties. Another thing is also apparent. The New York house intended that the securities in question should afford protection to the Manchester house for their acceptances, and the latter supposed that they were obtaining protection. Both parties acted upon the assumption that that which they did accomplished something. The New York house furnished security in the form desired by the Manchester house and the latter accepted the former's drawings upon that security. The transaction, if invalid, is only so because it contravenes some statute or positive legal principle; and it cannot be declared invalid without inflicting great hardship upon the Manchester house.

In determining the validity of the transaction, it is necessary, in the first place, to ascertain what its legal nature was. Judge WARD has held that it amounted to a declaration of trust by the New York house in favor of the Manchester house; but I cannot accept this conclusion. It is an essential element in a declaration of trust that title pass from the declarant of the trust as an individual to himself as trustee. It must be shown that he intends to divest himself of the beneficial interest in the property and to hold it thereafter as a trustee for the benefit of another. Now it is clear from the evidence that this is just what the New York house did not intend to do. They intended to set aside the obligations only as security for their indebtedness to the Manchester house. In case this indebtedness were paid, the latter were to have no interest in the security. The beneficial interest in the property, the equity of redemption, instead of passing to the Manchester house, as would be essential in a declaration of trust, was intended by both parties to remain in the New York house. The initial setting aside of the securities and the course of dealing between the two houses were, in my opinion, wholly inconsistent with the creation or existence of a declaration of trust. The transaction must stand, if at all, as one in which the Manchester house obtained security only.

Now security might have been afforded either by way of mortgage or pledge. The general distinction between a mortgage and a pledge is that in one the title passes, but not necessarily the possession; while in the other the title does not pass, but the possession must. A pledge is a mere lien and something less than a mortgage. As said by the Master of the Rolls in Jones v. Smith, 2 Ves. Jr., 372:

"A mortgage is a pledge and more, for it is an absolute pledge to become an absolute interest if not redeemed at a certain time."

In this case, the bonds, certificates of stock, promissory notes, and other securities were duly indorsed and assigned so that when Kessler & Co. of Manchester took possession of them shortly before the bankruptcy proceedings the title to them passed even if it had not done so before. Under these conditions there is the highest authority for saying that, when the Manchester house received the securities so indorsed and assigned, it had a double title to them—that of mortgagee and

pledgee. In the very case principally relied upon by the defendants (Casey v. Cavaroc, 96 U. S. 467, 477, 24 L. Ed. 779), the Supreme Court of the United States, in speaking of a case where bills receivable had been both pledged and assigned to a creditor, said:

"In such case they [the securities] are held by the creditor by way of mortgage as well as pledge, and a mortgage is valid notwithstanding the mortgagor has the possession. The difference ordinarily recognized between a mortgage and a pledge is that the title is transferred by the former, and possession by the latter. Indeed, possession may be considered as of the very essence of a pledge (Pothier, Nantissement, 8) ; and, if possession be once given up, the pledge, as such, is extinguished. The possession need not be actual. It may be constructive, as where the key of a warehouse containing the goods pledged is delivered, or a bill of lading is assigned. In such case the act done will be considered as a token, standing for actual delivery of the goods. It puts the property under the power and control of the creditor. In some cases such constructive delivery cannot be effected without doing what amounts to a transfer of the property also. The assignment of a bill of lading is of that kind. Such an assignment is necessary, where a pledge is proposed, in order to give the constructive possession required to constitute a pledge; and yet it formally transfers the title also. In such a case there. is a union of two distinct forms of security; that of mortgage and that of pledge; mortgage by virtue of the title, and pledge by virtue of the possession.

"This advantage exists when notes and bills are transferred to a creditor by way of collateral security. His possession of them gives them the character of a pledge. Their indorsement if payable to order, or their delivery if payable to bearer, gives him the title also, which is something more than a pledge. This double title existed in White v. Platt, 5 Denio (N. Y.) 269, and in Clark v. Iselin, 21 Wall. 360, 22 L. Ed. 568. Hence the actual possession of the securities by the creditor was a matter of less importance in those cases."

I fully appreciate that this language of the Supreme Court seems in conflict with the generally accepted doctrine that a pledge of choses in action does not necessarily become a mortgage because the title is conveyed. In the case of a chose in action there cannot well be a pledge without an assignment. Thus, if negotiable paper does not require indorsement, title passes to the pledgee upon delivery; if indorsement is necessary, the fact that it is made does not, it is generally held, necessarily make the transaction a mortgage. In such a case it is necessary that the pledgee should have the title in order to obtain effectual security. Consequently, it has usually been said in the case of indorsed shares of stock and negotiable paper that whether a transaction should be regarded as a mortgage or a pledge must be determined from the agreement between the parties.

Accepting this latter view as correct, there is much to support the contention that the parties in this case intended something more than a pledge. They used the word "escrow," which has usually to do with the passing of title. The securities were delivered to the Manchester house as being its property, and they had previously been set aside and marked with its name. But I think it unnecessary to determine whether the transaction was a mortgage or a pledge. It is sufficient to say, in view of the decision of the Supreme Court, as well as in view of the facts shown in addition to the indorsements indicating a mortgage, that the Manchester house, after taking possession, may safely be regarded as holding both by way of mortgage and by way of pledge.

Indeed, the case of Casey v. Cavaroc, supra, would seem to afford authority for the conclusion that the transaction might be valid as a mortgage even if Kessler & Co. of Manchester had not taken actual possession of the securities before the bankruptcy. As shown in the extract from the opinion already quoted, the matter of the physical possession of securities is of less importance when they are so indorsed that title will pass than when there is a mere attempted pledge. And in another part of the opinion the court said (96 U. S. 486, 24 L. Ed. 568):

"It must not be overlooked that the Crédit Mobilier has no other claim to the securities in question but that of pledge. A pledge, and possession, which is its essential ingredient, must be made out, or their privilege fails. An agreement for a pledge raises no privilege. There is no mortgage, for the title of the securities was never transferred to them. The evidence of the cashier is that they were all stamped payable to the order of the bank, when discounted. They were not indorsed by the cashier until the day they were removed by Cavaroc, which was after the bank had failed."

Moreover, were the fact of taking possession absent in this case, it would probably be possible to sustain the claim of the Manchester house to the securities upon broader and more satisfactory lines than could be drawn from the distinction just referred to. The legal difference before delivery of indorsed and unindorsed securities, except in the case of special indorsements, would seem to be slight; but the equities of the case, coupled with what the parties did, aside from any technicality, make out a strong case in support of an equitable lien in the nature of a mortgage upon the securities in favor of the Manchester house, valid against the trustee in bankruptcy without a change of possession. It is unnecessary, however, to determine the case, nor to consider it at length, upon the theory that there was no change of possession because, as we have seen, the Manchester house did take possession of the securities, and such act is a factor of importance, and, as already shown, after the Manchester house took possession it held the securities both by way of mortgage and by way of pledge.

Now, there being no fraud in the transaction and no rights of purchasers or attaching creditors having intervened, the taking possession of the securities by the Manchester house before the bankruptcy was, in the absence of a statute making it unlawful, entirely legal and proper. Regarded simply as a pledge, the pledgee had the right to take possession. Thus in Parshall v. Eggert, 54 N. Y. 18, the court said:

"In the absence of any intermediate right, the parties could perfect a written contract of pledge by subsequent delivery. Even between successive pledgees, without any communication with each other, that one who lawfully obtains possession, at the time of the pledge or subsequently, is entitled to be preferred. * * * A creditor who acquires a specific right to or lien on the thing pledged may prevent the pledgee's interest in an undelivered chattel from attaching; but such is not the condition of the creditor at large. The only ground on which he can claim to prevent the perfecting of such a right in the pledgee is that it works a fraud upon him."

And in Jones on Pledges (2d Ed.) § 38, it is said:

"A pledge or contract for a pledge, ineffectual for want of delivery, may be rendered valid by a subsequent delivery, even as against an intermediate creditor at large of the pledgor. Of course, such subsequent delivery would not

prevail against a creditor who had, between the time of the making of the contract and taking possession under it, acquired a specific lien upon the thing pledged by attachment or levy of execution. The only other obstacle which could prevent such a transaction from being effectual would be the intervention of fraud."

When therefore the Manchester house obtained possession of the securities, it lawfully held them as pledgee and mortgagee, unless its rights were affected by some statute; and the only statute which it claimed to operate against it is the provision of the bankruptcy act (Act July 1, 1898, c. 541, § 60b, 30 Stat. 562 [U. S. Comp. St. 1901, p. 3445]), making transfers of property made under certain conditions within four months of bankruptcy unlawful preferences. So the primary question whether the act applies in this case is whether, within its meaning, the securities in question were transferred within four months of the bankruptcy. If they were not so transferred, there was no preference, and the determination of the question of time will dispose of all questions concerning the securities constituting the general escrow.

Manifestly at some time there was a transfer of the securities. When did it take place? If it took place at the time the parties intended to charge the securities for the benefit and protection of the Manchester house, when they were put aside and indorsed, when the equities of the Manchester house were created, it took place more than four months prior to the bankruptcy. If, on the other hand, it took place only when the physical possession of the securities was taken, it was within the prescribed period.

Now, as bearing upon this question of time, it is clear that the Manchester house had the right at any time to demand and take possession of the securities set aside for its benefit. While the necessity for immediately taking possession was evidently not contemplated by the parties, I think that the very fact that the securities were set aside "in escrow" shows that the right of the Manchester house to take possession was recognized at the beginning. Delivery upon condition is the very essence of an escrow, and, while that term was improperly used by the parties here to describe their transaction, I think it still carries with it the idea of delivery; and, there being no agreement otherwise, delivery would take place when required by the Manchester house. I have no doubt that after demand the Manchester house could have enforced its rights to the possession of the securities in equity if not in law.

The possession having been actually taken within four months of the bankruptcy, we now reach the decisive question whether it can be held to relate back to the time when the right to take possession was created—whether the act of taking possession created a lien, or merely enlarged and perfected an existing lien. And, in my opinion, in view of the equities between the parties and all the circumstances, such act should relate back to the creation of the right which it perfected, and the transfer be regarded as having taken place more than four months before the bankruptcy.

The case of Thompson v. Fairbanks, 196 U. S. 516, 25 Sup. Ct. 306, 49 L. Ed. 577, seems directly in point here. In that case a mortgagee

took possession, with the consent of the mortgagor, of after-acquired property covered by a valid mortgage within four months before bankruptcy proceedings against the mortgagor; but the Supreme Court held that this was done pursuant to a pre-existing right and did not constitute a preference, and quoted with approval the following extract from Sabin v. Camp (C. C.) 98 Fed. 974, where it was held that a transaction which was consummated within the prescribed period was not a preference, because it had originated before:

"What was done was in pursuance of the pre-existing contract, to which no objection was made. Camp furnished the money out of which the property, which is the subject of the sale to him, was created. He had good right, in equity and in law, to make provision for the security of the money so advanced, and the property purchased by his money is a legitimate security, and one frequently employed. There is always a strong equity in favor of a lien by one who advances money upon the property which is the product of the money so advanced. This was what the parties intended at the time, and to this, as already stated, there is, and can be, no objection in law or in morals; and when, at a later date, but still prior to the filing of the petition in bankruptcy, Camp exercised his rights under this valid and equitable arrangement to possess himself of the property and make sale of it in pursuance of his contract, he was not guilty of securing a preference under the bankruptcy law."

The Supreme Court then went on to say:

"The principle that the taking possession may sometimes be held to relate back to the time when the right so to do was created is recognized in the above case. So in this case, although there was no actual existing lien upon this after-acquired property until the taking of possession, yet there was a positive agreement, as contained in the mortgage and existing of record, under which the inchoate lien might be asserted and enforced, and, when enforced by the taking of possession, that possession, under the facts of this case, related back to the time of the execution of the mortgage of April, 1891, as it was only by virtue of that mortgage that possession could be taken. The Supreme Court of Vermont has held that such a mortgage gives existing lien by contract, which may be enforced by the actual taking of possession, and such lien can only be avoided by an execution or attachment creditor, whose lien actually attaches before the taking of possession by the mortgagee. Although this after-acquired property was subjected to the lien of an attaching or an execution creditor, if perfected before the mortgagee took possession under his mortgage, yet, if there were no such creditor, the enforcement of the lien by taking possession would be legal, even if within the four months provided in the act. There is a distinction between the bald creation of a lien within the four months, and the enforcement of one provided for in a mortgage executed years before the passage of the act, by virtue of which mortgage, and because of the condition broken, the title to the property becomes vested in the mortgagee, and the subsequent taking possession becomes valid, except as above stated."

See, also, Humphrey v. Tatman, 198 U. S. 91, 25 Sup. Ct. 567, 49 L. Ed. 956; Wood v. United States Fidelity, etc., Co. (D. C.) 143 Fed. 424.

I think these principles applicable here. While the Supreme Court in the cases referred to treats the validity of the mortgages and the rights of the mortgagees thereunder to be matters of local law, in my opinion it also states this underlying and controlling distinction: The exercise of a pre-existing right well founded in equity is not a preference, although occurring within the prescribed period. "The bald creation of a lien within four months" is a preference.

The application of the principle involved in this distinction is de-

cisive here in favor of the Manchester house. It had an equitable right to the securities which were held "in escrow" for its benefit. Its rights and equities were created years before the bankruptcy. It could at any time have enforced its right to the possession of the securities. No element of fraud and no intervening rights of purchasers or attaching creditors appear. The securities were not property the possession of which would be visible to third persons and afford a basis of credit. It is my opinion that possession was taken pursuant to a pre-existing right, and that equitable principles support such right. I think that this is in no aspect a case of the bald creation of a lien within four months of bankruptcy.

The case of Zartman v. First National Bank, 189 N. Y. 273, 82 N. E. 127, 12 L. R. A. (N. S.) 1083, relied upon by the appellee as his principal case upon this point, is not in conflict with these views. In that case there was merely a contract to give a mortgage upon after-acquired property. There was no lien which could have been enlarged or perfected by taking possession.

Finally, I think it a serious question whether a mortgagee or pledgee taking possession of property in pursuance and in the enforcement of a pre-existing right of long standing can properly be said to have reasonable cause to believe that the mortgagor in surrendering possession is intending to give him a preference. He takes possession in his own right of that which he looks upon as his own special property. Instead of regarding the transaction as a preference, he would, as suggested in Thompson v. Fairbanks, 196 U. S. 516, 25 Sup. Ct. 306; 49 L. Ed. 577, rather take it as a recognition of his right under his mortgage or pledge. See, also, Humphrey v. Tatman, 198 U. S. 93, 25 Sup. Ct. 567, 49 L. Ed. 956.

Upon principles similar to those already considered, I think that the taking of possession by the Manchester house of the securities embraced in the "special escrow" related back to its creation, and, consequently, that that transaction, although occurring within four months of the bankruptcy, was based upon a contemporaneous consideration and did not constitute a preference.

The decree of the District Court should be reversed, with costs.

LACOMBE, Circuit Judge. I concur in the conclusion that the decree should be reversed, for the reasons set forth in the opinion of Judge NOYES.