ERNST et al. v. MECHANICS' & METALS NAT. BANK OF CITY OF NEW YORK.

HOTCHKISS v. NATIONAL CITY BANK OF NEW YORK.

(Circuit Court of Appeals, Second Circuit.   December 9, 1912.)

No. 55—127.

1. BANKRUPTCY (§ 165*)—VOIDABLE "PREFERENCES"—ACTS CONSTITUTING.
    A transfer by an insolvent, to be a voidable "preference" under Bankruptcy Act July 1, 1898, c. 541. § 60b, 30 Stat. 562 (U. S. Comp. St. 1901, p. 3445), must be on account of a pre-existing debt, and where one gives an insolvent present value for a transfer, or where he makes an exchange of property, there is no preference.

    [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 259, 260, 266; Dec. Dig. § 165.*

    For other definitions, see Words and Phrases, vol. 6, pp. 5498, 5499; vol. 8, p. 7759.]

2. BANKRUPTCY (§ 165*)—VOIDABLE PREFERENCES—ACTS CONSTITUTING.
    A contract between a bank making loans from day to day to a stockbroker and the broker, which stipulates that the day loans shall be used specifically for the release of the broker's pledged securities, that their proceeds or the proceeds of substituted securities shall be immediately deposited in the bank in repayment of the loan, and that the broker shall actually take up the pledged securities and deliver them to purchasers against payment of the price, does not create a voidable preference by the broker within Bankruptcy Act July 1, 1898, c. 541, § 60b, 30 Stat. 562 (U. S. Comp. St. 1901, p. 3445), and it makes no difference under the contract that the bank does not know what specific securities are to be released.

    [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 259, 260, 266; Dec. Dig. § 165.*]

3. BANKRUPTCY (§§ 165, 188*)—VOIDABLE PREFERENCES—ACTS CONSTITUTING.
    A bank made loans to a stockbroker from day to day pursuant to an agreement stipulating that securities deposited by the broker with the bank as collateral should be held by the bank as security for any other liability to the bank then existing or subsequently contracted, and that the bank could require the deposit with it of collateral securities to an amount satisfactory to it, and on failure so to do the liabilities of the broker should at the option of the bank become due.   The bank, pursuant to the agreement, demanded security generally and took whatever security it could procure; but neither it nor the broker when transfers were made spoke of securities specifically covered by loans.   *Held*, that the bank did not acquire an equitable lien on securities subsequently delivered and cash deposited by the broker, so as to prevent a subsequent delivery and deposit becoming a voidable preference under Bankruptcy Act July 1, 1898, c. 541, § 60b, 30 Stat. 562 (U. S. Comp. St. 1901, p. 3445).

    [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 259, 260, 266, 270, 286–295; Dec. Dig. §§ 165, 188.*]

**4. CUSTOMS AND USAGES (§ 15*)—PAROL EVIDENCE—VARYING WRITTEN CONTRACTS.**

A written contract between a bank making loans from day to day to a stockbroker and the broker, stipulating that securities deposited by the broker as collateral should be held by the bank as security for any other liabilities of the broker, then existing or thereafter contracted, and that the bank could at all times require the broker to deposit other security as collateral to an amount satisfactory to the bank, etc., contemplated collateral delivered against loans and was not contradicted or modified by proof of a usage as to which day loans were to be applied.

[Ed. Note.—For other cases, see Customs and Usages, Cent. Dig. §§ 30–33; Dec. Dig. § 15.*]

**5. BANKRUPTCY (§ 165*)—"PREFERENCE"—ACTS CONSTITUTING.**

A bank made clearance loans to a stockbroker from day to day, and such loans were credited to his general account. All the moneys received by the broker in the course of his business throughout the day from whatever source was deposited in the bank and credited to the general account. In the course of the day, the broker drew and had certified checks against the account used to pay off demand or time loans and obtained the release of collateral securities, or to take up securities which he had agreed to purchase or to borrow stock for delivery or for the substitution of securities; but it was understood that no portion of the proceeds of the day or clearance loan would be used for any purpose other than to clear securities. The securities so received by the broker were mingled with all other securities coming into his possession in the course of his daily business, and the securities were used by him to make deliveries on sales in the course of his business, or as collateral in new demand or time loans, or were substituted for other collateral then in demand or time loans. He kept no separate account of the moneys received on deliveries of stock acquired by him, and all moneys received by him were deposited to the credit of his account with the bank. Checks received by him from the sale of securities cleared by the proceeds of the day or clearance loans were deposited with the bank to pay off such clearance loans. It was necessary for him to obtain a demand or time loan at the stock exchange for the bank. The collateral security used for such loans might be any or all securities in his possession, or he might apply directly to the bank for a new demand loan on securities in his possession. The amount of the loan was credited to his general account and the clearance loan would be paid at the close of the day by check drawn against the account. The broker generally repaid the bank for the loan on the same day, and generally with the proceeds of the released securities or of substituted securities, and it was understood and expected that that should be done. *Held*, that securities delivered to the bank by the broker while insolvent constituted a voidable preference within Bankruptcy Act July 1, 1898, c. 541, § 60b, 30 Stat. 562 (U. S. Comp. St. 1901, p. 3445).

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 259, 260, 266; Dec. Dig. § 165.*]

**6. BANKRUPTCY (§ 305*)—PREFERENCES—LIABILITY.**

Where a trustee in bankruptcy left the disposition of securities transferred by the bankrupt to a bank to the absolute discretion of the bank, their proceeds if sold to stand in the place of the securities, the trustee, entitled to avoid the transfer as a preference within the bankruptcy act, was entitled only to a return of the securities and an accounting as to any dividends or interest collected in the meantime; and he could not hold the bank liable for a depreciation in the value of the securities.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 466–468; Dec. Dig. § 305.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

7. BANKRUPTCY (§ 166*)—VOIDABLE PREFERENCE—ACTS CONSTITUTING.

A deposit in a bank by a depositor after the bank has knowledge of his insolvency, or at least after the bank is put on inquiry, to repay a loan, is a voidable preference under Bankruptcy Act July 1, 1898, c. 541, § 60b, 30 Stat. 562 (U. S. Comp. St. 1901, p. 3445).

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 250-258; Dec. Dig. § 166.*]

Appeals from the District Court of the United States for the Southern District of New York; Learned Hand, Judge.

Suits by Irvine L. Ernst and another, as trustee in bankruptcy, against the Mechanics' & Metals National Bank of the City of New York, and by Henry D. Hotchkiss, as trustee in bankruptcy, against the National City Bank of New York. From decrees granting relief (200 Fed. 287, 295, 299), defendants appeal, and Hotchkiss, as trustee, also appeals. Affirmed.

Joline, Larkin & Rathbone, of New York City (L. H. Freedman, Adrian H. Larkin, and Leland B. Garretson, all of New York City, of counsel), for appellant Mechanics' & Metals Nat. Bank.

Shearman & Sterling and John A. Garver, all of New York City, for appellant National City Bank.

William A. Barber, of New York City (Abram I. Elkus, of New York City, of counsel), for appellant Hotchkiss.

Hays, Hershfield & Wolf, of New York City (Daniel P. Hays and Edwin D. Hays, both of New York City, of counsel), for appellees.

As to the Ernst Case:

Before LACOMBE, COXE, and WARD, Circuit Judges.

As to the Hotchkiss Case:

Before LACOMBE, WARD, and NOYES, Circuit Judges.

WARD, Circuit Judge. These cases are alike in respect to the main question involved, which is said to be of great importance to the business of stockbrokers in New York City and may be disposed of together as to it. Certain features in which they differ will be considered separately.

January 19, 1910, between 12 and 1 o'clock, the stockbroking firms of J. M. Fiske & Co. and Lathrop, Haskins & Co. failed, as the result of the collapse of a pool or pools in the stock of the Columbus & Hocking Valley Coal & Iron Company.

At the beginning of banking hours on that day Fiske & Co. had arranged for a day or clearance loan of $400,000 from the Mechanics, now the Mechanics' & Metals National Bank, and Lathrop, Haskins & Co. had arranged for one of $500,000 from the National City Bank. The banks, becoming uneasy about the financial condition of the brokers as the day progressed, demanded security for their accounts and obtained from each a large quantity of collaterals. Between 12 and 1 o'clock the firms notified the Stock Exchange that they were unable to meet their engagements, and subsequently each was adjudicated a bankrupt. The trustee of each estate brought a plenary action in equity for recovery of the securities or their value as a preference

voidable by him under section 60 of the Bankruptcy Act and also in the case of Fiske & Co. for some $54,000 in cash deposited by them on the morning of the 19th in their account with the bank. The proceedings were referred to a special master, who took testimony and reported that each transaction was a voidable preference and directed the banks to account for the securities and cash to the trustees in bankruptcy of the failed firms. This report was confirmed by the District Court, and the banks have taken the appeals which are now to be disposed of.

Fiske & Co. had been dealing with the Mechanics' National Bank since November 8, 1901, under the following written contract:

"Know all men by these presents that the undersigned, in consideration of financial accommodations given, or to be given, or continued to the undersigned by the Mechanics' National Bank of the City of New York, hereby agree with the said bank that whenever the undersigned shall become or remain directly or contingently, indebted to the said bank for money lent, or for money paid for the use or account of the undersigned, or for any overdraft or upon any indorsement, draft, guaranty, or in any other matter whatsoever, or upon any other claim, the said bank shall then and thereafter have the following rights, in addition to those created by the circumstances from which such indebtedness may arise against the undersigned, or his, or their executors, administrators or assigns, namely:

"(1) All securities deposited by the undersigned with said bank, as collateral to any such loan or indebtedness of the undersigned to said bank shall also be held by said bank as security for any other liability of the undersigned to said bank, whether then existing or thereafter contracted; and said bank shall also have a lien upon any balance of the deposit account of the undersigned with said bank existing from time to time, and upon all property of the undersigned of every description left with said bank for safe-keeping or otherwise, or coming to the hands of said bank in any way, as security for any liability of the undersigned to said bank now existing or hereafter contracted.

"(2) Said bank shall at all times have the right to require from the undersigned that there shall be lodged with said bank as security for all existing liabilities of the undersigned to said bank, approved collateral securities to an amount satisfactory to said bank; and upon the failure of the undersigned at all times to keep a margin of securities with said bank for such liabilities of the undersigned satisfactory to said bank, or upon any failure in business or making of an insolvent assignment by the undersigned, then and in either event all liabilities of the undersigned to said bank shall at the option of said bank become immediately due and payable, notwithstanding any credit or time allowed to the undersigned by any instrument evidencing any of the said liabilities.

"(3) Upon failure of the undersigned either to pay any indebtedness to said bank when becoming or made due, or to keep up the margin of collateral securities above provided for, then and in either event said bank may immediately without advertisement, and without notice to the undersigned, sell any of the securities held by it as against any or all of the liabilities of the undersigned, at private sale or broker's board or otherwise and apply the proceeds of such sale as far as needed toward the payment of any or all such liabilities together with interest and expenses of sale, holding the undersigned responsible for any deficiency remaining unpaid after such application. If any such sale be at broker's board or at public auction, said bank may itself be a purchaser at such sale free from any right or equity of redemption of the undersigned, such right and equity being hereby expressly waived and released. Upon default as aforesaid, said bank may also apply toward the payment of the said liabilities all balances of any deposit account of the undersigned with said bank then existing.

"It is further agreed that these presents constitute a continuing agree-

ment, applying to any and all future as well as to existing transactions between the undersigned and said bank."

On January 19th they applied for a day loan (which was granted), as follows:

"New York, January 19, 1910.
"Mechanics' National Bank, New York City:
"Please loan us to-day $400,000. Crediting this amount to our account, and oblige,                                          J. M. Fiske & Company."

On the same day Lathrop, Haskins & Co. applied to the National City Bank for a day loan of $500,000 and signed two notes differing only in amount, in the following form:

"$300,000.                                    New York City, January 19, 1910.
"On demand for value received we promise to pay to the National City Bank of New York, or order, three hundred thousand ($300,000) dollars, hereby agreeing that said bank shall have a lien upon all property of the undersigned now or hereafter in its possession or under its control, as security for any indebtedness of the undersigned now existing or hereafter contracted, with the right at any time to demand additional security, and with the right, upon default in payment, to sell, without advertisement or notice to the undersigned, any or all of the securities or property so held, at public expense or private sale, or to otherwise dispose of the same in the discretion of any of the officers of said bank, applying the proceeds upon the said indebtedness together with interest and expenses, legal or otherwise, the undersigned to be liable for any deficiency.
"Lathrop, Haskins & Co."

The proofs show that in New York City contracts of brokers to deliver stock sold and to pay for stocks purchased must be carried out the next day and that credit from banks is absolutely necessary to enable them to release the securities they have sold, which are generally pledged in banks or trust companies, and with their proceeds to pay for the securities they have bought. To enable them to clear these transactions the banks at 10 a. m. of each business day extend a credit which must be repaid by 3 p. m. of the same day. These loans are made from day to day and are called day or clearance loans; no interest being charged upon them.

[1] We have no doubt that both the firms in question were insolvent when they delivered the securities and deposited the cash and that the banks had reasonable cause to believe so. But it is not every transfer by an insolvent within the four months' period that is voidable by the trustee. It must be on account of a pre-existing debt. When one gives an insolvent present value for a transfer of property or when he makes an exchange of property, there is no preference. Authorities upon this subject may be found in Collier on Bankruptcy (8th Ed.) p. 664, and Loveland on Bankruptcy (4th Ed.) § 512.

[2] No doubt a contract might be made between a bank and a broker stipulating that the day loan should be used specifically for the release of the broker's pledged securities and that their proceeds or the proceeds of substituted securities should be immediately deposited in the bank in repayment of the loan. As it would not be possible for the bank itself to send around checks to the various trust companies and actually take up the pledged securities belonging to

its stockbroking depositors and deliver them to purchasers against payment of the price, the agreement of the broker to do this would make him agent or trustee of the bank and would seem to be quite sufficient to bring the transaction within the cases held not to constitute preferences. The loan and repayment the same day should be regarded as one transaction; the fact that they were not literally contemporaneous being a necessary result of the nature of the business. It would not be possible to act like a farmer, who holds the cow's tail in one hand until he gets payment for her in the other. We think it would make no difference, under such a contract, that the bank did not know what specific securities were to be released or that it permitted the broker to deliver the same to purchasers. See, on the subject generally, Sexton v. Kessler, 172 Fed. 535, 97 C. C. A. 161; Id., 225 U. S. 90, 32 Sup. Ct. 657, 56 L. Ed. 995; Mills v. Virginia-Carolina Lumber Co., 164 Fed. 168, 90 C. C. A. 154, 21 L. R. A. (N. S.) 901. A particularly apposite case is Dressel v. North State Lumber Co. (D. C.) 119 Fed. 531.

[3] In these cases the banks seek to escape by claiming that they had an equitable lien upon the securities subsequently delivered and cash deposited by the brokers and that they were receiving only their own property. Each of them, however, admits that it made the day loan under the written agreements above mentioned. Each contained provisions as to securities in the possession, but none as to securities not in the possession of the bank. Those in question here were not in the possession of the banks. Moreover, neither the banks nor the brokers when the transfers were made spoke of securities specifically covered by their loans. The banks simply demanded security generally and took whatever they could get. The conduct of the parties at the time is inconsistent with any claims to specific securities or their proceeds. We see no ground for claiming an equitable lien under these contracts alone.

[4] The banks, however, also allege a usage of the business which requires the clearance loan to be so applied which they seek to annex to the written contracts. It is objected that such a usage cannot be proved, because it contradicts or adds to the written contract. We do not think the usage contradicts the contracts because they contemplated collateral delivered against loans, whereas these day or clearance loans are never made against collateral. Proof of such a usage would only be as to the way in which the day loans were to be applied and would be entirely consistent with the written contracts. It may very well be that, if the broker failed to carry out the contract, equity would not aid the bank to the prejudice of creditors generally; but this is no ground for saying that, if the contract had been carried out, equity would intervene to disturb it.

[5] The following extract from a stipulation made in the case is the best statement made in support of the bank's claim:

"It is further stipulated that, if members of the stock exchange houses to which the said banks made the said so-called day or clearance loans were called as witnesses herein, each of the said brokers called would testify respectively that the amount of the so-called day or clearance loan was credited to his general account with the bank; that in this general account

there was also credited the balance he had on deposit with the bank at the opening of the day.

"That all of the moneys received by him in the course of his business throughout the day, from whatever source, was deposited with the bank making the so-called day or clearance loan, and credited to his general account as aforesaid.

"That in the course of the day he drew and had certified checks against the said account which were used to pay off demand or time loans and obtain the release of securities held as collateral thereto, or to take up stocks, bonds, or other securities which he had agreed to purchase, or to borrow stock for delivery, or for the substitution of securities; but it was expected and understood that no portion of the proceeds of the day or clearance loan was used for any purpose other than to clear securities, although the broker is at liberty to draw against the balance standing to the credit of his account in excess of that derived from said day or clearance loan to pay the general expenses of his business and to meet the general obligations thereof.

"That the securities he received as aforesaid were not kept separate, but were mingled with all the other securities coming into his possession in the course of his daily business, and that the said securities were freely and at all times used by him to make deliveries on sales made in the course of his business, or were used as collateral in new demand or time loans or were substituted for other collateral then in demand or time loans.

"That he kept no separate account of the moneys received on the deliveries of stock acquired by him as before mentioned, but that all the moneys received by him, in the course of the day, from whatever source, were deposited by him to the credit of his said account with the bank making the said loan.

"That the said day or clearance loans were paid off by his check or checks drawn to the order of the bank, at the close of the day. That during the day, as soon as checks were received by him from the sale of securities cleared by the proceeds of the day or clearance loan, or as soon as moneys were received by the broker from new loans made with the securities cleared by the day or clearance loan, the checks or moneys resulting therefrom were promptly deposited with the bank during the day as soon as or within a reasonable time after the same were received; and that in order to pay off such day or clearance loans, if he had not sufficient funds on deposit with said bank which made such day or clearance loans, it would be necessary for him to obtain a demand or time loan at the Stock Exchange for and on behalf of the identical bank making the day or clearance loan as aforesaid. The collateral security used for such demand or time loan might be any or all securities in his (the broker's) possession from whatever source and however those securities were acquired by him; or he (the broker) might, if occasion required, apply directly to the bank making the said day or clearance loan for a new demand loan on such securities in his possession as aforesaid, as would be acceptable to the bank, in order to discharge his indebtedness under the day or clearance loan at the close of the day. The amount of such loan would be credited to his general account with the bank and the so-called day or clearance loan would be paid at the close of the day by check drawn against this account."

We do not think that the usage alleged was proved. It was abundantly established that the brokers do repay banks for the clearance loan on the same day and generally with the proceeds of the released securities or of substituted securities and that it is understood or expected that this shall be done. This, however, only shows the way in which the business is done. It could hardly be done, and certainly could not be continued, in any other way. Such a course of business does not establish that the brokers have agreed to do these things, or are bound by usage to do them, or that the banks are entitled to the proceeds of the released securities. Indeed, we understand that the

question as to the rights and obligations of the parties if the broker fails to repay or secure the clearance loan on the day it was made is raised for the first time in the cases now under consideration. Therefore we agree with the conclusion of the special master and the court below on the main question involved in both cases.

There are two particulars in which the cases differ from each other, now to be considered separately.

[6] In the case of the National City Bank, the trustee claims that he is entitled to the value of the securities at the time they were transferred; they having in the meantime depreciated considerably. The Bankruptcy Act, § 60b, does provide that in the case of a voidable preference the trustee "may recover the property or its value." The special master and the court below, however, held, and we think rightly, that the trustee had left the disposition of the securities to the absolute discretion of the bank; their proceeds, if sold, to stand in their place. Under such circumstances, it would be inequitable to hold the bank liable for the depreciation. All the trustee is entitled to is a return of the securities and an accounting as to any dividends or interest collected in the meantime.

[7] In the case of the Mechanics' National Bank, a deposit was made by Fiske & Co. on the morning of January 19th, which the trustee claims should be returned with interest as a voidable preference; this for the reason that the bank had ordered no more certifications to be made before the deposit was received, which it is contended was a closing of the account, so that the relation of debtor and creditor between the firm and the bank did not exist as to this fund. The special master and the court below held that the deposit was made after the bank had knowledge of the broker's insolvency or at least was put on inquiry, so that the deposit was a voidable preference, just as much as the delivery of the securities. In this view we concur.

The decrees are affirmed.

NOYES, Circuit Judge (concurring). I concur in the conclusion reached in the National City Bank Case, and in the opinion except so far as it discusses the question whether a valid contract could be made to cover the situation. I think that question does not arise in the case and prefer to express no opinion upon it.