THEODORE H. MACDONALD, INSURANCE COMMISSIONER, *vs.* THE AETNA INDEMNITY COMPANY (IN RE CLAIM OF THE BANK OF BUFFALO).

First Judicial District, Hartford, March Term, 1916.

PRENTICE, C. J., THAYER, RORABACK, WHEELER and BEACH, Js.

The liability of an indemnity company on its bond is to be determined by the law of the State in which the obligation was delivered and in which all the other contracts relating to the transaction in question were made.

The principal issue in the present case, upon which the liability of the

Bank of Buffalo v. Aetna Indemnity Co.

defendant indemnity company depended, was whether or not a warehousing company had taken and maintained such possession of the grain turned over to it as to make the grain a valid pledge and effective against the general creditors of the pledgor. The business conducted by the warehousing company was known as "field storage warehousing," the premises upon which it was carried on being owned by the pledgor, who leased them to the company. This lease was recorded, although the law did not require it. The lessee marked the corners of the plot of ground so leased with stakes which bore its corporate initials; and it appointed, as its custodian of the grain, an employee of the pledgor, who without any additional compensation agreed to see that enough grain was kept on hand to meet outstanding warehouse receipts issued by the warehousing company. Subject to this restriction, the pledgor had the right, apparently, to sell the grain from time to time as he saw fit, and none of it was at any time segregated or marked in any way. After this condition had continued for about two years and a half, the president of the pledgor company died and immediately thereafter the warehousing company asserted its right to the possession of the grain on the premises, placarded the interior of the mill, the elevator, the bins and bags, with conspicuous signs declaring its interest in such property, and maintained this claim for two or three weeks until ousted by a receiver appointed by a Federal court, who took and held possession against all comers, in one instance by armed force. *Held:*—

1. That while the possession of the grain originally taken by the warehousing company was insufficient to render it a valid pledge against general creditors of the insolvent pledgor, yet its subsequent action prior to the appointment of the receiver was the taking of an actual possession and was therefore, in the absence of fraud and of the acquisition of a specific lien by a creditor, effective to convert what had theretofore been an inchoate lien, or the right to obtain a lien, into a valid, perfected lien; and that this possession as pledgee related back to the time its right to take possession was created under its contract.

2. That the taking of actual possession by the warehousing company, although within four months of the adjudication of the pledgor's bankruptcy, was not an illegal preference under the Bankrupt Act, the transfer being valid under the local law and there being no intent to hinder or defraud creditors.

3. That the pledgee in taking possession pursuant to and in enforcement of its pre-existing right, was presumed, prima facie, to be acting in good faith and not with intent to obtain an illegal preference.

4. That upon the facts as found there was no negligence upon the part of the warehousing company in permitting the grain to be taken from it by the receiver of the insolvent pledgor.

The receiver contended that the warehousing company had reasonable cause to believe that by taking possession of the grain under its pledge it was thereby gaining an illegal preference under the Bankrupt Act. *Held* that this question was one of fact, the burden of proving which rested upon the receiver, who asserted it; and that in the present case no facts were found from which such a conclusion could be drawn.

Argued March 8th—decided April 19th, 1916.

APPEAL by the receiver of the Aetna Indemnity Company from an order and decree of the Superior Court in Hartford County, *Gager, J.*, in receivership proceedings, allowing a claim of the Bank of Buffalo in the sum of $9,455. *Error, judgment to be entered disallowing the claim of the Bank of Buffalo.*

On January 5th, 1906, one Rodebaugh was engaged in the grain business in Buffalo, New York, and later on a corporation, the Niagara Company, succeeded to the business of Rodebaugh, and he became its president and a Mr. Chase its secretary and treasurer.

The American Warehousing Company was on this day engaged in the business known as "field storage warehousing," in the course of which it issued its warehouse receipts for grain or flour stored on the premises of the pledgor and leased to it. On said day Rodebaugh and the Warehousing Company entered into a written contract by which Rodebaugh agreed to deliver all of his grain upon his premises which he had leased to the company, as well as other grain which might thereafter come upon the premises, and to guarantee the title of the same, and to keep and maintain at all times on the premises the full amount of grain called for by the warehouse receipts; and the Warehousing Company agreed to receive and store the grain and issue its receipts therefor and to deliver the grain upon surrender of the receipts and payment of charges.

On January 5th, 1906, Rodebaugh leased his property

on which his grain business was conducted to the Warehousing Company, and on January 25th, 1907, the Niagara Company executed a new lease to the Warehousing Company.

On January 5th, 1906, the Warehousing Company entered into a contract with Mr. Chase, then an employee of Rodebaugh and later the secretary and treasurer of the Niagara Company, by which he, for a monthly salary paid him by it, agreed to act as custodian of the grain so stored, and keep enough grain on hand to cover all outstanding warehousing receipts. Chase turned over to Rodebaugh the salary so paid, so that in fact Chase received nothing for his services as custodian. The goods then and thereafter so stored were not segregated nor marked in any way. The corners of the plot on which the warehousing depot stood were marked by stakes upon which were the initials of the Warehousing Company. The agreement with the company was not disclosed in any way except through the said lease recorded in the county clerk's office.

In January, 1906, the president of the Warehousing Company explained to the president of the Bank of Buffalo the method of business between Rodebaugh and the company, and submitted to him for his examination the contract and lease between them.

In January, 1907, the president of the bank suggested that as the Niagara Company had succeeded to the business of Rodebaugh, it should execute a lease to the Warehousing Company of the premises, and this was done.

On or about January 15th, 1907, Rodebaugh was indebted to the Bank of Buffalo in the sum of $10,000. On January 27th, 1907, as collateral security for this debt, the Warehousing Company executed and delivered to the bank two of its warehousing receipts of

certain flour, etc., from Rodebaugh, and agreed to deliver the same to the bank. As further security the Warehousing Company delivered to the bank two bonds of the defendant, the Aetna Indemnity Company, by which it agreed to make good unto the bank any loss that might accrue to it "through the negligence or dishonesty" of the Warehousing Company, or its custodian, according to the terms of the receipt.

Rodebaugh died August 9th, 1907, and on this and the day following the Warehousing Company asserted its right to possession of the grain and placarded the interior of the mill, the elevator, the bins and bags, with conspicuous signs declaring its interest in such property.

On August 23d, 1907, an involuntary petition in bankruptcy was filed against the Niagara Company, and Bartlett was appointed receiver and subsequently trustee. He took and held possession against all comers, in one instance by armed force. The Warehousing Company made demand of him for the return of this property, but this demand was refused. Shortly thereafter, at his request, the court, against the objection of the bank and the Warehousing Company, ordered the goods to be sold and the proceeds to be held subject to its further order.

The receiver sold the goods for $10,631.29, and later the court refused to consider the conflicting claims to the fund on the ground of want of jurisdiction. Subsequently the receiver brought an action in the Supreme Court of the State of New York against the Warehousing Company, the bank, and other claimants to the fund. The parties to the action stipulated that the bank should receive $2,521.36 from this fund to be applied on its debt against Rodebaugh, the same to be received without prejudice to the cause of action, if any, of the bank against the Warehousing Company

and the Aetna Indemnity Company. The court made its order in accordance with this stipulation and this sum was so paid to the bank.

Rodebaugh died insolvent, and the Niagara Company and the Warehousing Company were on August 23d, 1907, and have since been, insolvent.

On September 20th, 1907, the bank made due claim on the Aetna Indemnity Company to indemnify it under the terms of the bonds. The value of the property covered by the warehousing receipts was on the date of such demand equal to the sum of $10,000.

*J. Birney Tuttle* and *Ralph H. Clark*, for the appellant (Receiver of the Aetna Indemnity Company).

*John Leroy Kenefick* of Buffalo, New York, and *Harry W. Reynolds*, with whom was *Lewis Sperry*, for the appellee (the Bank of Buffalo).

WHEELER, J. The Bank of Buffalo presented its claim against the Aetna Indemnity Company, basing it upon two bonds issued by it to the bank to secure two warehouse receipts given by the American Warehousing Company to the Niagara Mill and Elevator Company, and pledged by it to secure the payment of a loan of $10,000 made by the bank to the Niagara Company. This appeal is from an order of the Superior Court allowing the claim.

Under the terms of its bonds the Aetna Indemnity Company agreed to make good to the bank any loss that might accrue to it through the negligence or dishonesty of the Warehousing Company or its custodian, according to the terms of the warehouse receipts.

The bank claims that the failure of the Warehousing Company to deliver the merchandise pledged with it, upon the demand of the bank, was due to the negligence

of the Warehousing Company. The trial court so held and in its memorandum of decision said: "It was clearly the negligence of the Warehousing Company in not taking and retaining possession of the property described in the warehouse receipts that led to its failure to have the goods when demanded by the Bank of Buffalo."

The failure of the Warehousing Company to take and retain possession of the goods pledged, made, the bank contends, the pledge ineffective against general creditors of the Niagara Company, and constituted negligence, and as a consequence a breach of these bonds.

All of the contracts surrounding this transaction, including that arising from the delivery of these bonds, were made in New York, and hence are governed by the law of New York.

The Warehousing Company was engaged in the business of field storage warehousing, that is, it warehoused the goods of the bailor, in this case Rodebaugh and his successor, the Niagara Company, upon the premises leased by the bailor to it, and issued its warehouse receipts to the bailor who gave them as collateral security for credit obtained by him. Apparently the bailor continued in control of the premises and the goods therein, with the right to sell the goods, provided he continued ready to meet the demand of the holder of the receipts.

In New York this business is not uncommon, and is entirely legitimate.

In this case the grain for which warehouse receipts were issued was fungible, and by the terms of the contract between the Warehousing Company and the Niagara Company, the latter could sell the grain from time to time provided it had on hand upon demand the amount of grain called for by the receipts.

The bank maintains that a pledge of property with a field-warehousement is ineffectual against the creditors of the bailor where it is not segregated and marked, and that without these no valid possession of the pledge is taken.

The receiver maintains that the Warehousing Company had possession from the inception of its contract with Rodebaugh, because of (1) its marking of the corners of the premises on which the grain was stored, (2) its rights as lessee of the premises on which the grain was stored and the public record of the lease, and (3) its designation of a custodian of the grain and his continuance as custodian until he surrendered it to the Warehousing Company.

We incline to the opinion that there was, at the inception of this transaction, no sufficient taking of possession of the thing attempted to be pledged to make it a valid pledge against general creditors. The marking was not adequate notice. The recording was not required by law, and hence no constructive notice. The custodian remained an employee of the pledgor and any possession he may have had was that of his employer; the repayment to his employer of the compensation paid him as custodian indicates this. *Mathews* v. *Hardt*, 79 N. Y. App. Div. 570, 581, 80 N. Y. Supp. 462; *American Can Co.* v. *Erie Preserving Co.*, 171 Fed. Rep. 540, affirmed, 105 C. C. A. 388, 183 Fed. Rep. 96; *Security Warehousing Co.* v. *Hand*, 206 U. S. 415, 27 Sup. Ct. 720. Had the receiver obtained possession prior to the Warehousing Company doing more, the bank's claim that it was negligent in failing to take possession of the grain pledged to it by contract must have been sustained.

Did the assertion of the right to possession, and the placarding of the premises and its contents by the Warehousing Company two weeks prior to the appoint-

ment of the receiver and one month before the Niagara Company was adjudicated a bankrupt, change this? Counsel for the bank argue that this assertion of a right to possession and the accompanying placarding were not an attempt to perfect an existing lien, but to create a lien which as to the creditors of the Niagara Company did not theretofore exist.

What was done by the Warehousing Company was the taking of actual possession of this grain. Its contract with Rodebaugh, and hence with the Niagara Company, was one of pledge. As a pledgee it had the right to the possession of the thing pledged. Its attempt in the beginning to take possession was ineffective; it had the right to secure its lien by taking possession. Until this was done its lien was inchoate. When it did take possession it was in fulfilment of its right to perfect the lien of its contract of pledge, and not in creation of a new right. Under the law of New York, and the general law of the land, a contract for a pledge, ineffectual for want of delivery of the pledge, can be made effectual by delivery of the thing pledged. Of course, fraud will prevent the inchoate lien becoming perfected, and so too will the acquisition of a specific right to a lien on the pledge by a creditor. The finding of the committee discloses neither fraud nor bad faith, and no acquisition of a specific right of lien upon the grain by any creditor at the time the Warehousing Company took possession. *Parshall* v. *Eggert*, 54 N. Y. 18; *Niles* v. *Mathusa*, 162 N. Y. 546, 57 N. E. 184; *National Bank of Deposit* v. *Rogers*, 166 N. Y. 380, 59 N. E. 922; *Sexton* v. *Kessler & Co.*, 225 U. S. 90, 32 Sup. Ct. 657.

Its inchoate lien having become perfected, the possession of the Warehousing Company as pledgee related back to the time its right under its contract to take possession was created. It could not be disturbed

in its possession unless some statute invalidated its possession.

The bank insists that, under the Federal Bankruptcy Act, the seizure of possession by the Warehousing Company was a preference within that Act, open to attack by any creditor of the bankrupt because the perfecting of the lien was within the four-months period of the Act which makes transfers of property within such period under certain circumstances unlawful preferences.

The validity of this lien is by the United States Supreme Court made to rest upon the local law of New York. The immediate question is whether the exercise of the right to take possession of the pledged property within the four-months period constituted an illegal preference. Had the transfer been made upon a present consideration, with no intent to hinder or to defraud creditors, it could not be attacked as an illegal preference. Nor does it make it an illegal preference where the consideration was past and the transfer was made in perfecting a pre-existing agreement of pledge and within four months of bankruptcy, provided the transfer was valid under the local law and made with no intent to hinder or defraud creditors. The exercise of a pre-existing right, lawful in the local jurisdiction, although occurring within the prescribed period, is not an illegal preference unless made with intent to hinder or defraud creditors. The pledgee taking possession in pursuance of and in the enforcement of his pre-existing right is prima facie presumed to take in the belief in his right and not in the belief that his taking is with intent to give himself a preference. *Thompson* v. *Fairbanks*, 196 U. S. 516, 25 Sup. Ct. 306; *Humphrey* v. *Tatman*, 198 U. S. 91, 94, 25 Sup. Ct. 567; *Sexton* v. *Kessler & Co.*, 225 U. S. 90, 98, 32 Sup. Ct. 657; *Sexton* v. *Kessler & Co.*, 97 C. C. A. 161, 172 Fed. Rep. 535, 540; *In re Automobile Livery Service Co.*,

176 Fed. Rep. 792, 795; *Dale* v. *Pattison*, 234 U. S. 399, 34 Sup. Ct. 785; *Taney* v. *Penn Bank*, 232 U. S. 174, 34 Sup. Ct. 288.

To set aside this pledge by the terms of the statute, it must appear that "the person receiving it, or to be benefited thereby, or his agent acting therein, shall have had reasonable cause to believe that it was intended thereby to give a preference." *Pyle* v. *Texas Transport Co.*, 238 U. S. 90, 98, 35 Sup. Ct. 667. Whether the Warehousing Company had "reasonable cause to believe" was a question of fact, and the burden of proof of this was on the receiver. The committee finds no facts from which such a conclusion could be drawn. Its findings completely overthrow the claim that the Warehousing Company gained possession of this grain by an unlawful preference. *Pyle* v. *Texas Transport Co.*, 238 U. S. 90, 97, 35 Sup. Ct. 667.

Since the Warehousing Company was not negligent in taking possession of this grain, our next inquiry is whether it was negligent in permitting the grain to be taken from it by the receiver. The finding answers this. The receiver took possession of the grain, asserted possession against all, including the Warehousing Company, in one instance by armed force. The possession of the Warehousing Company was taken from it by an officer of the Federal court acting under its order. Thereafter the Warehousing Company "demanded the return of its possession, but such demand was not acceded to." The report of the committee shows the course of the receiver to have been without justification in law, and that of the Warehousing Company to have been reasonable and diligent. Negligence can only be predicated upon a failure in duty, and the Warehousing Company acted within its rights and fully performed its duty. It was not negligent, and hence the defendant's bonds were not breached.

There is error, the order is reversed and the cause remanded with direction to the Superior Court to render judgment disallowing the claim of the Bank of Buffalo.

In this opinion the other judges concurred.